# United States Court of Appeals

## For the Eighth Circuit

_____

No. 14-1154

_____

Ritchie Capital Management, LLC, as administrative and collateral agent; Ritchie Special Credit Investments, Ltd.; Rhone Holdings II, Ltd.; Yorkville Investments I, L.L.C.; Ritchie Capital Structure Arbitrage Trading, Ltd.

*Appellant*s

v.

John R. Stoebner, Trustee

*Appellee*

------------------------------

JPMorgan Chase Bank, N.A.

*Amicus Curiae*

Douglas A. Kelley, as Chapter 11 Trustee; The Official Committee of Unsecured Creditors of Petters Company, Inc. and Petters Group Worldwide, LLC; National Association of Bankruptcy Trustees

*Amici on Behalf of Appellee(s)*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: October 7, 2014
Filed: March 10, 2015
_____

Before RILEY, Chief Judge, WOLLMAN and BYE, Circuit Judges.
_____

RILEY, Chief Judge.

This case marks yet another dispute stemming from Tom Petters's multi-billion dollar fraud. The bankruptcy trustee for Polaroid Corporation (Polaroid)—a Petters company—succeeded in the bankruptcy court[1] in avoiding as fraudulent the transfer of several Polaroid trademarks to the appellants—Ritchie Capital Management, L.L.C.; Ritchie Special Credit Investments, Ltd.; Rhone Holdings II, Ltd.; Yorkville Investments, I, L.L.C.; and Ritchie Capital Structure Arbitrage Trading, Ltd.[2] On appeal, the district court[3] affirmed the bankruptcy court's decision. Ritchie appeals, and having jurisdiction under 28 U.S.C. § 158(d)(1), we now affirm.

---

[1]The Honorable Gregory F. Kishel, Chief Judge of the United States Bankruptcy Court for the District of Minnesota.

[2]The appellants are a group of distinct companies who loaned Petters and his corporation, Petters Group Worldwide, LLC (PGW), money in 2008—with Ritchie Capital Management serving as administrative agent on the loans. Although separate entities, each of the appellants is a party to the September 19, 2008 Trademark Security Agreement (TSA), which the bankruptcy trustee is seeking to avoid, so the appellants' interests are aligned for the purpose of this appeal. We adopt the appellants' practice of referring to themselves as a single entity and collectively describe the appellants as "Ritchie" throughout this opinion.

[3]The Honorable Susan Richard Nelson, United States District Judge for the District of Minnesota.

# I.    BACKGROUND

The specifics of Petters's Ponzi scheme[4] and the numerous resulting civil disputes have been described in detail in several of this court's other opinions. See, e.g., United States v. Petters, 663 F.3d 375, 379-80 (8th Cir. 2011); Ritchie Capital Mgmt., L.L.C. v. Jeffries, 653 F.3d 755, 758-60 (8th Cir. 2011); Ritchie Special Credit Invs., Ltd. v. U.S. Trustee, 620 F.3d 847, 850-51 (8th Cir. 2010). We recite only those facts most relevant to the instant appeal. Petters, through his company Petters Company, Inc. (PCI), purported to run a "diverting" business that purchased electronics in bulk and resold them at high profits to major retailers. The business was a sham, and the only influx of money came from loans or investments. Petters was convicted of multiple counts of mail fraud, wire fraud, and money laundering perpetrated through PCI and PGW and was sentenced to fifty years in prison.

In 2005, Petters, as PGW's sole board member, directed PGW to purchase Polaroid, becoming the 100% beneficial owner of Polaroid stock, and Petters became the sole member and "Chairman" of Polaroid's board of directors. Although a subsidiary of PGW, Polaroid operated as an independent, stand-alone corporation and engaged in legitimate business operations. On at least two occasions, Petters took several million dollars from Polaroid to satisfy PCI debts.

In late 2007 and early 2008, Petters's companies—including Polaroid—began to experience "major" financial difficulty. On January 31, 2008, a broker for PGW approached Ritchie about obtaining a loan. The next day, Ritchie loaned PGW $31 million to pay off Polaroid and PGW debts. The loan bore an 80% annual interest rate and was to be repaid within ninety days. Petters personally guaranteed the loan,

---

[4]"Ponzi schemes are fraudulent business ventures in which investors' 'returns' are generated by capital from new investors rather than the success of the underlying business venture. This results in a snowball effect as the creator of the Ponzi scheme must then recruit even more investors to perpetuate the fraud." In re Armstrong, 291 F.3d 517, 520 n.3 (8th Cir. 2002).

but Ritchie was told the loan would also be "backed by the entire Polaroid corporation." The note stated, "[T]he parties shall endeavor, as soon as reasonably practicable, to secure this Note . . . by a pledge of 100% of the capital stock of . . . the Polaroid Corporation." Throughout February, Ritchie extended a number of additional loans, totaling $115 million, under the same terms.[5] On May 9, 2008, Ritchie lent PGW and PCI an additional $12 million to be repaid in three weeks and bearing 362.1% annual interest. Polaroid was not a signatory on any of the loans, and although the initial loan was used to repay a Polaroid debt, the proceeds of the loans did not go to Polaroid.

By September 1, 2008, all of the loans were past due, and Ritchie began demanding collateral to secure the overdue loans. On September 19, five days before Petters was raided by the Federal Bureau of Investigation (FBI), Petters executed a Trademark Security Agreement (TSA) giving Ritchie liens on several Polaroid trademarks as consideration for Ritchie's extensions of the loans' repayment dates.

Polaroid's CEO, Mary Jeffries, objected to the TSA because she feared it would impede Polaroid's ability to raise new capital for the company. Although Polaroid had valuable assets such as trademarks, it had a cash shortage and was having trouble paying its creditors. The TSA did include a carve-out permitting Polaroid to grant first-priority liens on the trademarks to secure up to $75 million in working capital.

On September 24, 2008, the FBI, suspecting Petters's fraud, raided Petters's offices and home—a raid that would lead to his eventual conviction. Shortly thereafter, Ritchie sent notice that Petters was in default and accelerated the amounts

---

[5]Ritchie subsequently sold two of these loans, totaling $25 million, to a third party.

due on all of the loans. Polaroid filed for Chapter 11 reorganization on December 18, 2008.

Polaroid sued Ritchie arguing, among other things, the TSA was unenforceable because it resulted from an actual fraudulent transfer under both federal and Minnesota bankruptcy law. Polaroid's proceeding was thereafter converted to a Chapter 7 bankruptcy, and John R. Stoebner was appointed trustee (trustee) and substituted as a party. See In re Polaroid Corp., 420 B.R. 484, 486 n.1 (Bankr. D. Minn. 2009). The trustee filed a motion for partial summary judgment on the actual fraudulent transfer claim based on the "Ponzi scheme presumption." The bankruptcy court stayed proceedings on the remaining claims and, applying both the Ponzi scheme presumption approach and, alternatively, the traditional "badges of fraud" inquiry, presumed Petters executed the liens with fraudulent intent. The bankruptcy court also found Ritchie could not rebut this presumption because Ritchie had not received the liens in good faith and for value. The bankruptcy court then granted the trustee's motion for summary judgment.

Ritchie appealed to the district court, challenging the bankruptcy court's presumption of actual fraudulent intent and the admission of expert testimony from accountant Theodore Martens. Ritchie did not challenge the bankruptcy court's finding that Ritchie had not received the liens in good faith and for value. The district court determined the bankruptcy court had not abused its discretion in admitting the expert testimony, upheld the bankruptcy court's application of the Ponzi scheme presumption, and did not address the badges of fraud analysis. Ritchie appeals.

## II.    DISCUSSION

This court reviews de novo the bankruptcy court's grant of summary judgment. See In re Cochrane, 124 F.3d 978, 981 (8th Cir. 1997). "Summary judgment was properly granted if, assuming all reasonable inferences favorable to the non-moving

party, there is no genuine [dispute] as to any material fact and the moving party is entitled to judgment as a matter of law. Where [as here] the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." Id. at 981-82 (internal citations omitted). Given the particular legal issues involved in this case, a discussion of background principles is warranted.

"Under 11 U.S.C. § 548(a), the Trustee is given authority to avoid transfers . . . on the ground of actual fraud or on the ground of constructive fraud." Lovell v. Mixon, 719 F.2d 1373, 1376 (8th Cir. 1983); see 11 U.S.C. § 548(a)(1) ("The trustee may avoid any transfer . . . incurred by the debtor[] that was made or incurred on or within 2 years before the date of filing of the petition."). Here, the bankruptcy court addressed only the trustee's actual fraud claim, which requires the trustee to show the transfer was made "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted." 11 U.S.C. § 548(a)(1)(A); see also Minn. Stat. § 513.44(a)(1) ("A transfer . . . is fraudulent . . . if the debtor made the transfer or incurred the obligation . . . with actual intent to hinder, delay, or defraud any creditor of the debtor."). "Because proof of actual intent to hinder, delay or defraud creditors may rarely be established by direct evidence, courts infer fraudulent intent from the circumstances surrounding the transfer." In re Sherman, 67 F.3d 1348, 1353 (8th Cir. 1995).

"Since the time of Queen Elizabeth I, the courts have recognized that certain factual situations are so unfair as to be evidence of the actors' fraudulent intent." Jackson v. Star Sprinkler Corp. of Fla., 575 F.2d 1223, 1237 (8th Cir. 1978).

> English courts . . . developed the doctrine of "badges of fraud": proof by a creditor of certain objective facts (for example, a transfer to a close relative, a secret transfer, a transfer of title without transfer of possession, or grossly inadequate consideration) would raise a rebuttable presumption of actual fraudulent intent. Every American bankruptcy law has incorporated a fraudulent transfer provision; the 1898 Act

specifically adopted the language of the Statute of 13 Elizabeth. Bankruptcy Act of July 1, 1898, ch. 541, § 67(e), 30 Stat. 564-565.

BFP v. Resolution Trust Corp., 511 U.S. 531, 540-41 (1994) (internal citations omitted).  The Uniform Fraudulent Transfer Act (UFTA), initially written in 1918, "was a codification of the 'better' decisions applying the Statute of 13 Elizabeth" that sought to bring some uniformity into various states' fraudulent transfer jurisprudence. UFTA prefatory note (1984).

"[O]ur cases have used the inferential 'badges of fraud' approach to determine whether a debtor acted with 'intent to hinder, delay, or defraud[]' a creditor regardless of whether the intent language came from a state fraudulent transfer statute or applicable bankruptcy law."  In re Addison, 540 F.3d 805, 811-12 (8th Cir. 2008) (applying Minnesota's statutory badges of fraud to both state and federal fraudulent transfer claims).  The UFTA, as enacted at Minn. Stat. § 513.44(b), "contains a lengthy list of factors or 'badges of fraud' which a court may look to for help in determining actual intent."  In re Sholdan, 217 F.3d 1006, 1008 (8th Cir. 2000). "Once a trustee establishes a confluence of several badges of fraud, the trustee is entitled to a presumption of fraudulent intent.  In such cases, 'the burden shifts to the transferee to prove some legitimate supervening purpose for the transfers at issue,'" Kelly v. Armstrong, 141 F.3d 799, 802 (8th Cir. 1998) (internal citations omitted) (quoting In re Acequia, Inc., 34 F.3d 800, 806 (9th Cir. 1994)), namely that the transferee accepted the transfer in good faith and for value, see 11 U.S.C. § 548(c).

Several courts have decided "[w]ith respect to Ponzi schemes, transfers made in furtherance of the scheme are presumed to have been made with the intent to defraud for purposes of recovering the payments under [11 U.S.C.] § 548(a)." Perkins v. Haines, 661 F.3d 623, 626 (11th Cir. 2011); see also In re DBSI, Inc., 476 B.R. 413, 422 (Bankr. D. Del. 2012) ("'[A]ll payments made by a debtor in furtherance of a Ponzi scheme are made with actual fraudulent intent.'" (quoting In

-7-

re World Vision Entm't, Inc., 275 B.R. 641, 658 (Bankr. M.D. Fla. 2002)).[6] Through this Ponzi scheme presumption, a court may bypass the badges of fraud analysis and infer actual fraudulent intent if it (1) finds the existence of a Ponzi scheme, and (2) determines the transfer was made in furtherance of that scheme. See DBSI, 476 B.R. at 422. The trustee and various amici urge us to either adopt or reject this presumption. We need not do so because we affirm the bankruptcy court's finding of actual fraudulent intent under the badges of fraud approach. We thus draw no conclusions as to the validity or future applicability of the Ponzi scheme presumption in the Eighth Circuit.

## A. Badges of Fraud

Fraudulent transfer law focuses on the intent of the debtor. If the debtor transfers its assets with the intent to defraud its creditors, the transfer can be avoided as fraudulent. See 11 U.S.C. § 548(a); Minn. Stat. § 513.44(a). In a case that involves numerous entities, it is important to identify precisely *whose* intent is relevant to the consideration of fraudulent intent. Polaroid is the debtor. Polaroid granted the liens which the trustee seeks to avoid as fraudulent, so the relevant intent is Polaroid's. Because Petters unilaterally granted these liens on Polaroid's behalf,

---

[6]The Fifth, Sixth, Ninth, Tenth, and Eleventh Circuits have all utilized the Ponzi scheme presumption. See, e.g., Wing v. Dockstader, 482 F. App'x 361, 363 (10th Cir. 2012) (unpublished); Perkins, 661 F.3d at 626; In re AFI Holding, Inc., 525 F.3d 700, 704 (9th Cir. 2008); Warfield v. Byron, 436 F.3d 551, 558 (5th Cir. 2006); In re Mark Benskin & Co., 59 F.3d 170, 1995 WL 381741, at *5 (6th Cir. 1995) (unpublished table decision) (per curiam). While the Ponzi scheme presumption has curried favor in federal courts, the Minnesota Supreme Court recently rejected the presumption, holding, "[A]lthough a court could make a rational inference from the existence of a Ponzi scheme that a particular transfer was made with fraudulent intent, there is no statutory justification for relieving the Receiver of its burden of proving . . . fraudulent intent. Instead, fraudulent intent must be determined in light of the facts and circumstances of each case." Finn v. Alliance Bank, ___N.W.2d ___, ___, Nos. A12-1930, A12-2092, 2015 WL 672406, at *8 (Minn. Feb. 18, 2015) (internal marks and citation omitted).

his intent in transferring the liens *was* that of Polaroid. See Morris v. Union Pac. R.R., 373 F.3d 896, 902-03 (8th Cir. 2004) ("[A] finding of intent is a highly contextual exercise. . . . When a corporation is involved, the inquiry depends . . . to some extent on the intent of corporate employees, not all of whom will play the same role in every case."). Thus we consider Petters's intent here.

In conducting its badges of fraud analysis, the bankruptcy court found five of the badges listed in Minn. Stat. § 513.44(b), but observed that the badges "do not lie perfectly on their wording, for this case." We disagree with Ritchie's contention that this observation is an acknowledgment by the bankruptcy court that the badges of fraud "do not apply." Courts may consider any factors they deem relevant to the issue of fraudulent intent:

> Badges of fraud represent nothing more than a list of circumstantial factors that a court may use to infer fraudulent intent. Given the fact that direct evidence of fraud is rare, a court in most instances can only infer fraud by considering circumstantial evidence. Furthermore, we note that under section 513.44(b), a court is not limited to only those factors or "badges" enumerated, but is free to consider any other factors bearing upon the issue of fraudulent intent.

Sholdan, 217 F.3d at 1009-10 (internal citation omitted); see Minn. Stat. § 513.44(b) (explaining actual intent can be determined by considering the listed badges "among other factors"). While we may not totally agree with the bankruptcy court's analysis and application of all the badges, the bankruptcy court did not err in concluding the trustee was entitled to a presumption of actual fraudulent intent. Assessing the relevant factors, we conclude the circumstances surrounding the TSA "are so unfair [they amount to] evidence of [Petters's] fraudulent intent." Jackson, 575 F.2d at 1237.

### 1. Lack of Reasonably Equivalent Value

Perhaps the most salient fact here is Polaroid received no value in exchange for the TSA. See Minn. Stat. § 513.44(b)(8) ("In determining actual intent . . . consideration may be given . . . to whether . . . the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred."). "'The fact that valuable property has been gratuitously transferred raises a presumption that such transfer was accompanied by the actual fraudulent intent necessary to bar a discharge under clause (4).'" In re Bateman, 646 F.2d 1220, 1222 (8th Cir. 1981) (internal marks omitted) (quoting 1A Collier on Bankruptcy ¶ 14.47 (14th ed. 1978) and applying 11 U.S.C. § 32(c)(4) (1976) (repealed Oct. 1, 1979), which read, "The court shall grant the discharge unless satisfied that the bankrupt has . . . transferred . . . any of his property[] *with intent to hinder, delay, or defraud his creditors*" (emphasis added)).

Polaroid was not a party to the Ritchie loans and received no money from the loans, and Petters executed the TSA to prevent a PGW default. The TSA encumbered Polaroid's valuable trademarks without bestowing any real benefit on Polaroid. Ritchie argues Polaroid received value in the form of its parent company—PGW—staying viable after PGW was delinquent on the loans. However, the viability of a parent company is not the type of value contemplated by the fraudulent transfer laws. See Minn. Stat. § 513.43(a) ("Value is given for a transfer . . . if, in exchange for the transfer . . . , property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person."); see also, e.g., Stoebner v. Lingenfelter, 115 F.3d 576, 577-79 (8th Cir. 1997) (affirming a jury's finding that a corporation received no value for payments made on behalf of another corporation, when the two corporations were owned by the same individual).

## 2. Transfer for the Benefit of an Insider

Another significant badge of fraud is whether "the transfer . . . was to an insider." Minn. Stat. § 513.44(b)(1). This badge typically is implicated when the debtor, faced with impending insolvency, transfers property to a business partner or relative to place it beyond the reach of his creditors. See, e.g., Citizens State Bank Norwood Young Am. v. Brown, 849 N.W.2d 55, 62-63 (Minn. 2014) (deciding a debtor's cohabiting ex-wife was an insider); Sherman, 67 F.3d at 1354-55 (affirming the bankruptcy court's finding that the debtor's parents were insiders). "[I]f the debtor is a corporation," the definition of an "insider" includes "a person in control of the [corporation]." Minn. Stat. § 513.41(7)(ii)(C).

Polaroid executed the TSA for the sole benefit of Petters—an insider. At the time the lien was executed, Petters's Ponzi scheme was in a precarious financial position. The pool of willing investors had run dry and his companies were running out of money. One investor had already filed suit against Petters, and Ritchie—holding numerous overdue notes with no payment in sight—was "intense[ly]" demanding collateral. Petters became increasingly anxious during this period as he confronted the reality he would not be able to raise the capital needed to sustain his corporations.

The TSA tempered Ritchie and kept the loans—which Petters had personally guaranteed—out of default, at least temporarily. Yet the TSA merely postponed an inevitable default, because PGW had no foreseeable way to repay the Ritchie loans. Petters knew of Polaroid's money troubles, and the recent transfer of cash to PCI left Polaroid unable to make payments to its vendors. These dire circumstances indicate the transfer of the liens was nothing more than a desperate attempt to maintain a crumbling Ponzi scheme at the expense of Polaroid's creditors.

While the statutory badge of fraud—a "transfer . . . to an insider," Minn. Stat. § 513.44(b)(1)—does not apply directly, the factual context surrounding the transfer

supports an inference of fraudulent intent. Polaroid did not execute the liens *to* an insider, as the statute suggests, but the liens were executed *for the benefit of* an insider. Petters signed the TSA on Polaroid's behalf, but its sole purpose was to protect Petters and his crumbling Ponzi scheme. Like a bankrupt man who transfers his assets to his parents, see Sherman, 67 F.3d at 1354-55, Petters ensured Polaroid's valuable assets were put to a personally advantageous use.

Ritchie urges this court to disregard the circumstances of Petters's Ponzi scheme, arguing Petters's common control of PCI, PGW, and Polaroid is "a highly common scenario," and, "[a]s the 100% owner of Polaroid, Petters could use Polaroid's assets for *any* purpose." Ritchie claims Petters's "use of Polaroid's assets for a non-Polaroid purpose [is] not evidence that he intended to defraud Polaroid creditors when granting the Liens." When viewed in a vacuum, Ritchie's argument makes some sense. There is nothing per se fraudulent about an individual owning multiple entities and using the assets of one entity for the benefit of another, just as—standing alone—there is nothing fraudulent about a parent transferring assets to a child, see Shea v. Hynes, 95 N.W. 214, 214-15 (Minn. 1903). It is only after considering the facts and circumstances surrounding the transfer and finding "[t]he presence of several badges of fraud," Citizens State Bank, 849 N.W.2d at 66, that a court can infer intent to defraud. See Sholdan, 217 F.3d at 1009-10; Sherman, 67 F.3d at 1353-54. When considered in conjunction with the other indicia of fraud present in this case, Petters's execution of the liens for his personal benefit supports the bankruptcy court's presumption of actual fraudulent intent.

### 3. Polaroid's Solvency

"'Among the more common badges of fraudulent intent at the time of transfer [is] . . . insolvency or other unmanageable indebtedness on the part of the debtor.'" Nat'l Credit Union Admin. Bd. v. Johnson, 133 F.3d 1097, 1102 (8th Cir. 1998) (quoting FDIC v. Anchor Props., 13 F.3d 27, 32 (1st Cir. 1994) (quoting Max Sugarman Funeral Home, Inc. v. A.D.B. Investors, 926 F.2d 1248, 1254 (1st Cir.

1991) (applying 11 U.S.C. § 548(a)(1)))); accord Minn. Stat. § 513.44(b)(9) (explaining "whether . . . the debtor was insolvent or became insolvent shortly after the transfer was made" is a factor to be considered when determining a debtor's intent). The parties dispute whether Polaroid was insolvent at the time of the transfer. Polaroid had a cash shortage and was having trouble paying creditors as its debts came due, but Ritchie contends Polaroid's valuable trademarks put its assets far above its liabilities. We construe the facts in the light most favorable to Ritchie, see Citizens State Bank, 849 N.W.2d at 61, and assume that Polaroid was solvent when it executed the TSA.

Regardless, the undisputed facts show Polaroid had serious financial difficulties before it granted the TSA, difficulties which Petters knew. These financial issues only worsened after Polaroid granted Ritchie the liens: the TSA was signed on September 19, 2008, and Polaroid filed for bankruptcy ninety days later on December 18, 2008. Polaroid's financial struggles and its inability to pay creditors shortly before and after the execution of the TSA necessarily enter into our consideration of whether Petters executed the TSA with the intent to defraud Polaroid's creditors. See Nat'l Credit Union, 133 F.3d at 1102 (listing "'insolvency *or other unmanageable indebtedness* on the part of the debtor'" as a badge of fraud (quoting FDIC, 13 F.3d at 32) (emphasis added)); cf. Sholdan, 217 F.3d at 1010 (deciding the fact that the debtor had filed for bankruptcy "immediately upon the heels of" the allegedly fraudulent transfer was relevant to a finding of intent to defraud).

### 4.    Polaroid's CEO's Objection

Also relevant to our inquiry, although not an enumerated statutory badge, is Polaroid CEO Mary Jeffries's objections to the TSA. At the time the TSA was executed, Polaroid had been operating at a loss and had a cash shortage, causing it to be delinquent on its payments to vendors—a problem exacerbated by Petters's "loans" of Polaroid money to PCI. In an attempt to alleviate these problems, Polaroid

was exploring financing options from a number of different sources. After first receiving a copy of the TSA on September 11, 2008—eight days before the document was signed—Jeffries informed Petters and another PGW official that she opposed the TSA. Jeffries feared the TSA would "ma[k]e it difficult to raise new financing for Polaroid . . . [b]ecause it was taking assets that would otherwise be used as collateral or value in Polaroid in raising capital."

Polaroid's issuance of a lien on its valuable trademarks over the objection of its own CEO is relevant in attempting to discern Petters's intent. Ritchie claims "Jeffries's 'objection' to the Liens carries no weight" because she was not aware of the carve-out in the TSA allowing Polaroid to use the trademarks to secure up to $75 million in working capital, which Ritchie alleges was more than sufficient to meet Polaroid's cash flow needs. To the contrary, Jeffries's objection gives insight into Petters's intent in executing the liens because it suggests Petters chose to issue the liens even knowing Polaroid's CEO feared the liens would thwart Polaroid's efforts to raise much-needed capital. Jeffries's lack of knowledge of the carve-out does not change this contention. Polaroid was seeking funding from multiple sources and, at the time the liens were executed, was negotiating with both a potential lender and a potential purchaser of Polaroid stock. The liens, even with the carve-out, reduced the collateral Polaroid had available to secure loans and had the potential to decrease Polaroid's value to an interested purchaser. Our focus is on *Petters's* intent, and Ritchie has presented no evidence suggesting Petters was aware of Jeffries's lack of knowledge of the carve-out. Petters executed the liens over the objection of Polaroid's CEO and complicated Polaroid's efforts to secure capital to repay its creditors.[7]

---

[7]In addition to the issue of Polaroid's solvency, the parties dispute whether the encumbered trademarks were "substantially all" of Polaroid's assets. See Minn. Stat. § 513.44(b)(5). Because this case comes to us at summary judgment, we construe fact disputes in Ritchie's favor. See Cochrane, 124 F.3d at 981. Even assuming Polaroid was solvent and had assets beyond the encumbered trademarks, the undisputed fact

We have no hesitation affirming the bankruptcy court's grant of summary judgment in favor of the trustee because Petters, acting on behalf of Polaroid, executed the liens with the actual intent to defraud Polaroid's creditors. Ritchie argues there can be no presumption of fraudulent intent because the trustee cannot prove Polaroid "removed, concealed or absconded with assets following the transfers," referencing Minn. Stat. § 513.44(b)(6), (7). Even at summary judgment, the law does not require the trustee prove *all* of the badges. "Once a trustee establishes a confluence of *several* badges of fraud, the trustee is entitled to a presumption of fraudulent intent." Kelly, 141 F.3d at 802 (emphasis added). We find sufficient undisputed evidence to support the bankruptcy court's conclusion that Petters executed the TSA with the intent to hinder, delay, or defraud Polaroid's creditors.[8]

## B.    Martens Affidavit

Ritchie finally argues the bankruptcy court erred in admitting an affidavit from forensic accountant Theodore Martens because the affidavit had not gone through the disclosure process mandated by Federal Rule of Bankruptcy Procedure 7026—which applies Federal Rule of Civil Procedure 26(a)(2)(B) to bankruptcy proceedings. This court "review[s] the admission of expert testimony . . . for abuse of discretion." Shuck v. CNH Am., LLC, 498 F.3d 868, 873 (8th Cir. 2007). The bankruptcy court reasoned, Rule 26's requirements, while technically not met, had been met in spirit because the trustee disclosed early in the process he would be relying on Martens's

---

Petters executed these liens in the face of Polaroid's cash shortage and over the objection of Jeffries—although not a listed badge—is certainly a relevant "factor[] bearing upon the issue of fraudulent intent." Sholdan, 217 F.3d at 1010.

[8]We note the bankruptcy court's finding of several badges of fraud was not the end of the inquiry, but merely shifted the burden to Ritchie to prove it took the liens in good faith and for value. See id. The bankruptcy court, however, concluded Ritchie could not meet its burden—a decision Ritchie did not appeal to the district court and does not appeal now.

testimony, and Ritchie was able to depose Martens, questioning him about the affidavit. Under these circumstances, Ritchie suffered no prejudice because of the lack of formal Rule 26 disclosure. The bankruptcy court did not abuse its discretion in admitting the Martens affidavit. See Crump v. Versa Prods., Inc., 400 F.3d 1104, 1110 (8th Cir. 2005) (holding a district court did not abuse its discretion in admitting expert testimony that had not been disclosed under Rule 26(a)(2)(B) because the parties suffered "no prejudice from [the] inadequate disclosure").

## III.   CONCLUSION

We affirm.

_____