# United States Court of Appeals
## For the Eighth Circuit

_____

No. 20-3330
_____

Douglas A. Kelley, in his capacity as the Trustee of the PCI Liquidating Trust

*Appellant*

v.

Safe Harbor Managed Account 101, Ltd.

*Appellee*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: October 20, 2021
Filed: April 21, 2022

_____

Before COLLOTON, SHEPHERD, and KELLY, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

This case is one of many arising from the multi-billion-dollar fraud perpetuated by former Minnesota businessman Thomas Petters through his company, Petters Company, Inc. (PCI). Appellant Douglas A. Kelley, in his capacity as Trustee of the PCI Liquidating Trust (Kelley), filed this adversary proceeding against Appellee Safe Harbor Managed Account 101, Ltd. (Safe Harbor) to recover nearly $6.9 million transferred to Safe Harbor as a subsequent transferee

of an entity that Kelley had previously obtained a default judgment against for transfers made to it by a PCI subsidiary. The district court granted summary judgment in favor of Safe Harbor, concluding that 11 U.S.C. § 546(e) shielded Safe Harbor from Kelley's avoiding powers. Having jurisdiction under 28 U.S.C. § 1291, we affirm in part, reverse in part, and remand for further consideration.

I.

Under Chapter 5 of the Bankruptcy Code (the Code), bankruptcy trustees have the authority to avoid certain pre-petition transfers made by the debtor and "'recaptur[e] the value of those avoided transfers for the benefit of the estate.' . . . Sections 544 through 553 of the Code outline the circumstances under which a trustee may pursue avoidance." Merit Mgmt. Grp., LP v. FTI Consulting, Inc., 138 S. Ct. 883, 888 (2018) (first alteration in original) (citation omitted). These avoiding powers allow trustees "[t]o maximize the funds available for, and ensure equity in, the distribution to creditors in a bankruptcy proceeding." Id. at 887-88. If a transfer is avoided, the trustee may recover the property transferred or its value from "the initial transferee of such transfer or the entity for whose benefit such transfer was made" or "any immediate or mediate transferee of such initial transferee," i.e., any subsequent transferee. 11 U.S.C. § 550(a). A trustee's avoiding powers are not boundless, however; "[t]he Code sets out a number of limits on the exercise of these avoiding powers." Merit Mgmt., 138 S. Ct. at 889. This case concerns the limitation, or safe harbor, set forth under 11 U.S.C. § 546(e), which provides in relevant part:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer . . . that is a transfer made by or to (or for the benefit of) a . . . financial institution . . . in connection with a securities contract, as defined in section 741(7), . . . that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

In simpler terms, where a transaction involves a transfer by, to, or for the benefit of a "financial institution" and that transfer is made "in connection with a securities contract," § 546(e) provides the financial institution immunity from the trustee's avoiding powers. See id. The only qualifying transfers exempt from § 546(e) are those that are actually fraudulent transfers under 11 U.S.C. § 548(a)(1)(A). See id. Section 546(e) "was enacted 'to minimiz[e] the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries.'" Picard v. Ida Fishman Revocable Tr. (In re Bernard L. Madoff Inv. Sec. LLC), 773 F.3d 411, 416 (2d Cir. 2014) (alteration in original) (citation omitted). "The theory underlying this section is that, '[i]f a firm is required to repay amounts received in settled securities transactions, it could have insufficient capital or liquidity to meet its current securities trading obligations, placing other market participants and the securities markets themselves at risk.'" Id. (alteration in original) (citation omitted); see also Deutsche Bank Tr. Co. Ams. v. Large Priv. Beneficial Owners (In re Tribune Co. Fraudulent Conveyance Litig.), 946 F.3d 66, 93 (2d Cir. 2019) ("A lack of protection against the unwinding of securities transactions would create substantial deterrents, limited only by the copious imaginations of able lawyers, to investing in the securities market."), cert. dismissed in part sub nom. Deutsche Bank Tr. Co. v. Robert R. McCormick Found., 141 S. Ct. 728 (2020), cert. denied sub nom. Deutsche Bank Tr. Co. Ams. v. Robert R. McCormick Found., 141 S. Ct. 2552 (2021).

The present matter stems from the bankruptcies that resulted from the collapse of Petters's Ponzi scheme,[1] the details of which have been documented in several of this Court's prior opinions. See, e.g., Stoebner v. Opportunity Fin., LLC, 909 F.3d 219, 221-22 (8th Cir. 2018); United States v. Petters, 663 F.3d 375, 379-80 (8th Cir. 2011); Ritchie Special Credit Invs., Ltd. v. U.S. Tr., 620 F.3d 847, 850-51 (8th Cir.

---

[1]"Ponzi schemes are fraudulent business ventures in which investors' 'returns' are generated by capital from new investors rather than the success of the underlying venture. This results in a snowball effect as the creator of the Ponzi scheme must then recruit even more investors to perpetuate the fraud." Kelley as Tr. for PCI Liquidating Tr. v. Boosalis, 974 F.3d 884, 887 n.1 (8th Cir. 2020) (citation omitted).

2010). The facts we recite today are those most relevant to the present appeal. Through PCI and its subsidiaries, Petters "purported to run a 'diverting' business that purchased electronics in bulk and resold them at high profits to major retailers." Ritchie Cap. Mgmt., LLC v. Stoebner, 779 F.3d 857, 859 (8th Cir. 2015). In actuality, no such diverting business existed, and Petters was running a scam held up by continuously enticing new investors. Petters's fraud was uncovered in September 2008, and in October 2008, PCI and other entities owned or controlled by Petters were placed into civil receivership. Subsequently, Kelley caused these entities to file voluntary petitions for relief under Chapter 11 of the Code. The bankruptcy court authorized joint administration of these cases, and Kelley was later appointed as Trustee for the PCI Liquidating Trust. Kelley has filed hundreds of lawsuits seeking to recover payments that these entities made to early investors for the benefit of later investors who lost their entire investments to Petters's Ponzi scheme. See Kelley, 974 F.3d at 888.

To understand how Safe Harbor became a target of Kelley's efforts to recover assets on behalf of the PCI Liquidating Trust, it is necessary to know the underlying players and understand their relationships with one another. MGC Finance, Inc. (MGC Finance) was a wholly owned subsidiary of PCI that served as a special purpose entity (SPE)[2] used by PCI to carry out its fraudulent activities. Arrowhead Capital Partners II, L.P. (Arrowhead) was a limited partnership formed and managed by Arrowhead Capital Management Corp. for the purpose of serving as a PCI feeder fund for Arrowhead's investors. Metro I, LLC (Metro), formerly known as Metro

_____

[2]Here, the SPEs formed by PCI served "as vehicles for the execution of lending and security transactions with particular 'investors'—i.e., lenders—that provided financing for PCI on a sustained basis. Each [SPE] was identified to a single lender or a single grouping of affiliated lenders." In re Petters Co., Inc., 506 B.R. 784, 789 (Bankr. D. Minn. 2013) (footnote omitted); see Black's Law Dictionary 1684 (11th ed. 2019) (defining "special-purpose entity" as "[a] business established to perform no function other than to develop, own, and operate a large, complex project . . . esp[ecially] so as to limit the number of creditors claiming against the project").

Gem Capital, LLC, was formed by Arrowhead Capital Management Corp.'s CEO as an SPE of Arrowhead.[3]  Metro's sole purpose was to facilitate the transfer of funds from Arrowhead to PCI through MGC Finance.  On July 18, 2001, MGC Finance entered into a Credit Agreement with Metro, which provided that Metro would make loans evidenced by promissory notes to MGC Finance (the MGC Finance Notes) for the purpose of financing PCI's diverting business.  That same day, Arrowhead and Metro entered into a Note Purchase Agreement, under which the promissory notes Metro received from MGC Finance were transferred directly to and held for the sole benefit of Arrowhead.

In 2002, making what it believed to be a typical investment, Safe Harbor invested a total of $6 million in Arrowhead.  In connection with its investment, Safe Harbor entered into a Limited Partnership Agreement and Subscription Agreement with and became an equity holder of Arrowhead.  Pursuant to the Private Placement Memorandum[4] for Arrowhead and the Custodial Agreement referenced therein, Safe Harbor wired funds into a "custodial" account held by Wells Fargo Bank (Wells Fargo).  The funds held in the Wells Fargo account were used by Arrowhead to purchase the MGC Finance Notes from Metro, and when Arrowhead received payment from MGC Finance on the notes it had purchased from Metro pursuant to the Note Purchase Agreement, those funds would flow back through the Wells Fargo account to repay investors such as Safe Harbor.  This was the case in September 2003 when Safe Harbor redeemed its investment in Arrowhead and received two wire transfers totaling nearly $6.9 million from the Wells Fargo account: one for $6

---

[3]In their briefing to this Court, the parties refer to Arrowhead and Metro as ACP II and Metro I, respectively.  However, for the sake of continuity, we adopt the same terminology used by the district court: Arrowhead and Metro.

[4]"A Private Placement Memorandum is used when securities exempt from registration pursuant to section 4(2) of the 1933 Securities Exchange Act are offered for sale.  The information included in a PPM is similar to that included in a prospectus for a nonexempt offering." Ligon v. Deloitte, Haskins & Sells, 957 F.2d 546, 547 n.2 (8th Cir. 1992) (citations omitted).

million as the return for its initial investment and another for $898,923.39 as the return on that investment.

In October 2010, Kelley commenced an adversary proceeding against Arrowhead seeking to avoid the transfers made by MGC Finance to Arrowhead. Arrowhead failed to answer or otherwise defend the case, and in March 2018, the bankruptcy court found that the transfers received by Arrowhead were avoidable "under 11 U.S.C. §§ 544(b), 548(a)(1)(A), 548(a)(1)(B), 550(a), 551, and 1106," Minnesota statutes, and "principles of unjust enrichment and disgorgement," and it granted Kelley in his capacity as Trustee of the PCI Liquidating Trust a $941,704,263.66 default judgment against Arrowhead, plus costs and prejudgment interest. See R. Doc. 22-10, at 3. On August 25, 2017, Kelley filed the adversary proceeding that is the subject of this appeal, alleging that the nearly $6.9 million Arrowhead subsequently transferred to Safe Harbor was recoverable under 11 U.S.C. §§ 550(a) and 551. Safe Harbor filed a motion to dismiss Kelley's complaint, alleging that § 546(e) precluded Kelley from recovering from Safe Harbor "because the subject transfers were 'settlement payments' or transfers 'in connection with a securities contract' made 'by or to (or for the benefit of' a 'stockbroker . . . , financial participant . . . or a financial institution.'" R. Doc. 1-15, at 15. The bankruptcy court denied Safe Harbor's motion to dismiss, ruling in an oral order that § 546(e) did not provide Safe Harbor immunity against Kelley's avoidance powers.

Following the bankruptcy court's denial of Safe Harbor's motion to dismiss, the parties conducted discovery. At the close of expert discovery, the case was transferred to the district court based upon Safe Harbor's request for a jury trial. Shortly thereafter, Safe Harbor filed a motion for summary judgment, arguing that Kelley may not recover the $6.9 million transferred to it by Arrowhead under § 550(a) because § 546(e) applies to the transfers made from MGC Finance to Arrowhead.[5] Specifically, Safe Harbor argued that "the evidence is undisputed that

[5]Though Kelley is seeking to claw back the subsequent transfers made by Arrowhead to Safe Harbor through this adversary proceeding, the focus of the § 546(e) analysis is the initial transfers made by MGC Finance to Arrowhead. This

the underlying transfers . . . were 'made to' a definitional financial institution – [Arrowhead], a customer of Wells Fargo" and "made 'in connection with a securities contract,'" namely, the Note Purchase Agreement. R. Doc. 21, at 12. The district court agreed with Safe Harbor, finding that because Arrowhead was a "financial institution," the Note Purchase Agreement was a "securities contract," and the relevant transfers were made "in connection" with the Note Purchase Agreement, § 546(e) applied. Kelley argues that the district court erred in finding that no genuine dispute of material fact existed as to whether (A) Arrowhead was a financial institution and (B) the relevant transfers were made "in connection with a securities contract." "We review the district court's grant of summary judgment *de novo*, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor." Chambers v. Pennycook, 641 F.3d 898, 904 (8th Cir. 2011).

## A.

The Code defines "financial institution" as including the customer of "an entity that is a commercial or savings bank" when that "entity is acting as agent or custodian for [the] customer . . . in connection with a securities contract (as defined in section 741)." 11 U.S.C. § 101(22)(A). The district court concluded that Wells Fargo is a commercial bank and was acting as custodian for its customer, Arrowhead, and therefore, Arrowhead was a "financial institution" under § 546(e). Though it is undisputed by the parties that Wells Fargo is a commercial bank and Arrowhead was its customer, the parties diverge over whether Wells Fargo was acting as Arrowhead's custodian.[6]

---

is because "[b]y its terms, the [§ 546(e)] safe harbor is a defense to the avoidance of the *initial* transfer. Hence, a subsequent transferee is protected indirectly to the extent that the initial transfer is not avoidable because of the safe harbor." Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, 594 B.R. 167, 197 (Bankr. S.D.N.Y. 2018) (citations omitted).

[6]The district court did not address whether Wells Fargo acted "in connection with a securities contract," and the parties do not argue this point on appeal. Thus,

Kelley first argues that the Supreme Court's decision in Merit Management controls this issue and the district court erred by relying on the Second Circuit's decision in In re Tribune. In Merit Management, the Supreme Court held that "the relevant transfer for purposes of the § 546(e) safe-harbor inquiry is the overarching transfer that the trustee seeks to avoid under one of the substantive avoidance provisions." 138 S. Ct. at 893. Thus, under this holding, where a trustee is trying to avoid a transfer made from A → C and the transfer was effectuated through B, a commercial bank, (i.e., A → B → C), the only transfer that matters for purposes of § 546(e) is the overarching transfer made from A → C. Id. at 888, 897. Merit Management explicitly left open, however, the question of whether a party to the overarching transfer may qualify "as a 'financial institution' by virtue of its status as a 'customer' under § 101(22)(A)." Id. at 890 n.2.

In re Tribune addressed the question left open by Merit Management, analyzing whether an intermediary bank acted as "agent" for one of the parties to the overarching transfer and, therefore, that party itself qualified as a "financial institution." 946 F.3d at 77-78. There, the party in question retained an intermediary bank, which itself was a "financial institution" for purposes of § 546(e), "to act as 'Depositary' in connection with" a leveraged buyout and tasked it with holding the purchase price of shares, receiving and retaining those shares on the party's behalf, and paying the tendering shareholders. Id. at 78. Under these facts, the Second Circuit found that the intermediary bank had acted as the party's "agent" and, thus, that the party itself was a "financial institution" as defined by § 101(22)(A) with respect to the transfers at issue. Id. at 80. Ultimately, after determining that § 546(e)'s other prerequisite was met—that is, that the relevant transfers were made "in connection with a securities contract"—the court found that § 546(e) applied to the transfers even after the Supreme Court's holding in Merit Management. Id. at 80-81.

we assume that the parties agree that Wells Fargo acted in connection with the Note Purchase Agreement.

-8-

Contrary to Kelley's argument, Merit Management does not control the outcome of this case. Rather, it merely clarifies that the relevant transfers for purposes of § 546(e) are the transfers from MGC Finance to Arrowhead, which neither Kelley nor Safe Harbor disputes. See 138 S. Ct. at 893. Further, we find that the district court only relied on In re Tribune for its basic assumption—that the customer of a financial institution may itself qualify as a financial institution for purposes of § 546(e) if it meets the definition set forth under § 101(22)(A)—which we do not disagree with. See 946 F.3d at 77-78; Merit Mgmt., 138 S. Ct. at 897 (finding that "[b]ecause the parties do not contend that either [party to the relevant transfer] is a 'financial institution' or other covered entity, the transfer falls outside of the § 546(e) safe harbor"). Thus, the district court did not err by relying on In re Tribune.

Kelley next argues that the district court erroneously based its conclusion that Wells Fargo acted as Arrowhead's "custodian" on Wells Fargo's position with respect to the transfers between Arrowhead and Safe Harbor and not the actual transfers Kelley sought to avoid (i.e., the transfers from MGC Finance to Arrowhead). Though the district court noted that Arrowhead's Private Placement Memorandum, which was reviewed by Safe Harbor prior to investing in Arrowhead, named Wells Fargo as Arrowhead's "custodian," the district court also discussed the flow of money through the Wells Fargo account with respect to both the transfers from Arrowhead to Safe Harbor and the transfers from MGC Finance to Arrowhead. See R. Doc. 38, at 4 ("[W]hen Safe Harbor made its investment in Arrowhead, it wired $6 million . . . to Wells Fargo where it was held in Arrowhead's cash account until [Arrowhead Capital Management Corp.'s CEO] directed the money to be used to purchase the secured Notes from Metro. Once the products the notes secured were delivered to the inventory buyer, the money would flow back the way it came, and investors would benefit." (citations omitted)); R. Doc. 22-2, at 25 (providing that Wells Fargo would receive funds relating to payments on notes issued by inventory brokers). Thus, it is not clear to us that the district court based its conclusion on Wells Fargo's position with respect to the transfers from Arrowhead to Safe Harbor

and not the transfers from MGC Finance to Arrowhead. Further, though Kelley characterizes this alleged error as "[i]mportant[]," Kelley provides no explanation as to why this alleged error would warrant reversal. See Appellant's Br. 22-23. Therefore, we decline to reverse the district court on this basis.

Finally, Kelley argues that this Court should remand because the district court failed to determine whether Wells Fargo was a "custodian" as defined by 11 U.S.C. § 101(11)(C). Having reviewed Kelley's briefing to both the bankruptcy and district courts, we find that this argument is being advanced for the first time on appeal and is, therefore, inappropriate for our consideration. Peter Kiewit Sons', Inc. v. Wall St. Equity Grp., 809 F.3d 1018, 1022 (8th Cir. 2016) ("Ordinarily, we do not consider an argument raised for the first time on appeal. We consider a newly raised argument only if it is purely legal and requires no additional factual development, or if a manifest injustice would otherwise result." (citation omitted)); see Drewes v. Schonteich, 31 F.3d 674, 678 n.6 (8th Cir. 1994) (refusing to consider argument not raised by trustee before the bankruptcy and district courts).

B.

In addition to requiring that a transfer be made by, to, or for the benefit of a financial institution, application of § 546(e) requires that the transfer be made "in connection with a securities contract, as defined in section 741(7)." 11 U.S.C. § 546(e). The district court concluded that because the Note Purchase Agreement was a "securities contract" and there was no dispute that the transfers were made "in connection with" the Note Purchase Agreement, this requirement had been met. See R. Doc. 38, at 11-12.

We first address Kelley's argument that the district court erred in determining that the Note Purchase Agreement was a securities contract. Section 741(7) defines "securities contract" as "a contract for the purchase, sale, or loan of a security." 11 U.S.C. § 741(7)(A)(i). The term "security" is defined by the Code as including a "note." 11 U.S.C. § 101(49)(A)(i). Contrary to Kelley's assertion that the district

-10-

court conducted no analysis before reaching its conclusion, the district court considered these provisions before determining that the Note Purchase Agreement "fit[] plainly within the statutory definition of a securities contract for purposes of § 546(e)." R. Doc. 38, at 11. We agree with the district court. Because the Code does not define "note," we give the "term its ordinary dictionary meaning." Union Pac. R.R. Co. v. Surface Transp. Bd., 863 F.3d 816, 825 (8th Cir. 2017); see also United States v. Hughes, 795 F.3d 800, 804 (8th Cir. 2015) ("When terms used in a statute are undefined, we give them their ordinary meaning." (quoting Asgrow Seed Co. v. Winterboer, 513 U.S. 179, 187 (1995))). At the time § 101 was first enacted, the term "note" was defined as "[a] unilateral instrument containing an express and absolute promise of signer to pay to a specified person or order, or bearer, a definite sum of money at a specified time." Black's Law Dictionary 1210 (4th ed. 1968); see also Webster's Third New International Dictionary 1543-44 (1976) (defining "note" as "a written or printed paper acknowledging a debt and promising payment" and "a written promise to pay"). This definition clearly encompasses the MGC Finance Notes, which provided that MGC Finance promised to pay Metro or its assigns a definite sum of money at a specified time. See R. Doc. 1-1, at 142-44. Therefore, because the term "security" includes a "note" and a "securities contract" is "a contract for the purchase . . . of a security," the Note Purchase Agreement— pursuant to which Arrowhead purchased the MGC Finance Notes from Metro, see R. Doc. 22-6, at 47—is a "securities contract" as defined by § 741(7)(A)(i). See In re Madoff, 773 F.3d at 417 ("Section 741(7) of the Bankruptcy Code, to which § 546(e) refers, defines 'securities contract' with extraordinary breadth . . . . [and] the term . . . expansively includes contracts for the purchase or sale of securities, as well as any agreements that are similar or related to contracts for the purchase or sale of securities." (emphasis omitted)).

Kelley next argues that the district court based its conclusion that the relevant transfers were made in connection with the Note Purchase Agreement on the mistaken belief that MGC Finance was party to the Note Purchase Agreement and, therefore, because the relevant transfers were not made in connection with the Note Purchase Agreement, this Court should reverse and remand with instructions to deny

-11-

Safe Harbor's motion for summary judgment. It is true that the district court confused MGC Finance and Metro in its order. At the beginning of its order, the district court states that "Kelley's action comes after a Bankruptcy Court entered default judgment against Arrowhead and avoided approximately $1 billion in transfers Arrowhead received from Metro I, LLC (formerly known as Metro Gem Capital, LLC and hereinafter 'Metro')." R. Doc. 38, at 1-2. This statement is incorrect; the default judgment entered against Arrowhead avoided transfers received from MGC Finance, not Metro. R. Doc. 22-10, at 2-3. In listing the parties and relevant non-parties, the district court makes no explicit mention of MGC Finance but describes Metro as "a special purpose entity for PCI" (a description consistent with MGC Finance) that "is organized under the laws of Delaware with its principal place of business in Minnesota" (a description consistent with Metro). R. Doc. 38, at 3. Later in its order, the district court states that "in 2008, it was discovered that Metro was one of many special purpose entities set up by Petters and PCI to perpetuate a multi-billion-dollar Ponzi scheme," but it was MGC Finance, not Metro, that served as a special purpose entity for PCI. R. Doc. 38, at 5; R. Doc. 1-1, at 2.

The consequence of the district court's errors is that, by confusing MGC Finance and Metro, it erroneously assumed that the party making the transfers to Arrowhead was party to the Note Purchase Agreement and, thus, that the relevant transfers were made in connection with a securities contract. Compare R. Doc. 38, at 4 ("Arrowhead entered into a separate Note Purchasing Agreement with Metro."), with R. Doc. 38, at 12 ("Because there is no dispute that the transfer Kelley is seeking to avoid (from Metro to Arrowhead) was made 'in connection' with the Note Purchase Agreement, the transfer qualifies for § 546(e)'s exception."). In reality, MGC Finance was not party to the Note Purchase Agreement. Still, this fact is not dispositive of the question of whether the transfers were made "in connection with" the Note Purchase Agreement. In In re Madoff, the Second Circuit noted that "[i]n the context of § 546(e), a transfer is 'in connection with' a securities contract if it is 'related to' or 'associated with' the securities contract." 773 F.3d at 421. There, the court rejected the "conten[tion] that in order for [certain] payments to have been

made 'in connection with' a securities contract, there must necessarily have been some relation or connection between the payment and the contract," determining instead that "[§] 546(e) sets a low bar for the required relationship between the securities contract and the transfer sought to be avoided" and "Congress could have raised the bar by requiring that the transfer be made 'pursuant to,' or 'in accordance with the terms of,' or 'as required by,' the securities contract" but instead, "merely required that the transfer have a connection to the securities contract." Id. at 422.

Safe Harbor invites this Court to determine that, notwithstanding the district court's error, the transfers from MGC Finance to Arrowhead were made "in connection with" the Note Purchase Agreement because the transactions between MGC Finance and Metro and Metro and Arrowhead were part of an "integrated transaction." See Appellee Br. 14-21. "Although we *may* affirm the district court's judgment on any basis supported by the record, we are not required to do so." Loftness Specialized Farm Equip., Inc. v. Twiestmeyer, 742 F.3d 845, 851 (8th Cir. 2014). Here, to affirm on this basis would require this Court to examine the specifics of each agreement involved in what Safe Harbor characterizes as an "integrated transaction" and the manner in which the parties and relevant nonparties operated in relation to these agreements. "[W]e believe it is prudent to refrain from such a fact-intensive analysis as it would be beneficial for the district court to decide these issues . . . in the first instance." Ritchie Cap. Mgmt., L.L.C. v. JP Morgan Chase & Co., 960 F.3d 1037, 1055 (8th Cir. 2020); see also Schweiss v. Chrysler Motors Corp., 922 F.2d 473, 476 (8th Cir. 1990) (stating that "where there are factual questions still to be resolved or we would benefit from having the [d]istrict [c]ourt decide the issue in the first instance," we may remand the matter to the district court). Thus, we find it appropriate to remand this matter so that the district court may examine the facts and decide in the first instance whether, despite the fact that MGC Finance was not party to the Note Purchase Agreement, the transfers from MGC Finance to Arrowhead were nonetheless made "in connection with" the Note Purchase Agreement.

## II.

Based upon the foregoing, we affirm the district court's findings that Arrowhead was a financial institution and the Note Purchase Agreement was a securities contract. However, we reverse and remand the district court's grant of summary judgment in favor of Safe Harbor so that the district court may determine whether the transfers from MGC Finance to Arrowhead were made "in connection with" the Note Purchase Agreement.

_____