# United States Court of Appeals

For the Eighth Circuit

_____

No. 19-1079

_____

Douglas A. Kelley, in his capacity as PCI Liquidating Trustee
for the PCI Liquidating Trust

*Appellee*

v.

Gus Boosalis

*Appellant*

_____

No. 19-2376
No. 19-2382
No. 19-2452

_____

Douglas A. Kelley, in his Capacity as PCI Liquidating Trustee
for the PCI Liquidating Trust

*Appellee*

v.

Chris M. Kanios and Steve Papadimos

*Appellants*

_____

Appeals from United States District Court
for the District of Minnesota

_____

Submitted: February 11, 2020
Filed: September 11, 2020

_____

Before LOKEN, BENTON, and KELLY, Circuit Judges.

_____

LOKEN, Circuit Judge.

This litigation arose from the financial losses caused by a $3.5 billion Ponzi scheme[1] perpetrated by Thomas Petters from 1994 to 2008 through his company, Petters Company, Inc. ("PCI"). The unfortunate saga has been documented in numerous cases throughout this circuit. See generally Ritchie Capital Mgmt., LLC v. Stoebner, 779 F.3d 857, 859-60 (8th Cir. 2015); United States v. Petters, 663 F.3d 375, 379-80 (8th Cir. 2011), cert. denied, 566 U.S. 990 (2012); Ritchie Special Credit Investments, Ltd. v. U.S. Tr., 620 F.3d 847, 849-52 (8th Cir. 2010); In re Petters Co., 494 B.R. 413, 417-20 (Bankr. D. Minn. 2013). We will limit this opinion to facts necessary to resolve these appeals.

PCI "purported to run a 'diverting' business that purchased electronics in bulk and resold them at high profits to major retailers." Ritchie Capital Mgmt., 779 F.3d at 859. Petters and his associates persuaded individual investors to make secured loans to finance specific purchases of electronics for resale. In reality, PCI engaged

_____

[1]"Ponzi schemes are fraudulent business ventures in which investors' 'returns' are generated by capital from new investors rather than the success of the underlying venture. This results in a snowball effect as the creator of the Ponzi scheme must then recruit even more investors to perpetuate the fraud." In re Armstrong, 291 F.3d 517, 520 n.3 (8th Cir. 2002).

in almost no purchase and sale transactions. Instead, it diverted the loan proceeds and used the proceeds of new loans to repay interest due on outstanding loans -- one of the largest Ponzi schemes ever created. See id. When the scheme collapsed, Petters was convicted of multiple federal offenses and currently serves a fifty year prison sentence. PCI filed for bankruptcy. Douglas A. Kelley is the liquidating trustee for the PCI Liquidating Trust ("the Trustee") in a consolidated Chapter 11 bankruptcy. He has filed more than two hundred cases seeking to recover ("claw back") PCI's interest payments to early PCI lenders for the benefit of later lenders who lost their entire loans to the Ponzi scheme. See In re Petters Co., 494 B.R. at 417-18.

These appeals involve the Trustee's separate claw back claims against lenders Gus Boosalis, a former floor trader on the Pacific Exchange, and government attorney Steve Papadimos and his wife, physician Chris Kanios, who live in a Toledo, Ohio suburb (collectively "Defendants"). The Trustee asserted claims under 11 U.S.C. § 544(b)(1), which permits a trustee to "avoid any transfer of an interest of the debtor . . . that is voidable under applicable law by a creditor holding an unsecured claim." Here, the "applicable law" is the Minnesota Uniform Fraudulent Transfers Act ("MUFTA"). Minn. Stat. §§ 513.41 et seq.[2] The principal balances of Defendants' loans were repaid when PCI shifted its borrowing to large institutional lenders some time before it filed for bankruptcy. The Trustee asserted claw back claims under MUFTA seeking only to recover payments of interest to Defendants on their loans to PCI.

Between 1995 and 2001, Boosalis was paid over $3.5 million in interest on loans to PCI. After lengthy discovery and a one week jury trial, the jury found that all interest payments were fraudulent transfers under MUFTA, and that Boosalis

---

[2]The Minnesota Legislature amended MUFTA in 2015, without affecting the provisions at issue, renaming it the "Uniform Voidable Transactions Act." See 2015 Minn. Sess. Law Serv. Ch. 17 (S.F. 1816) (West). Like the parties, we will refer to the statute as "MUFTA" to preserve a consistent record.

failed to prove an affirmative defense. Based on this verdict, the district court awarded approximately $3.5 million in damages and $2.9 million in prejudgment interest. Between July 1997 and March 2006, Papadimos loaned PCI $3,297,300.00 in many separate transactions. PCI paid $3,126,524.37 in interest on annual rates ranging from 12 to 48 percent. Kanios loaned PCI $690,000.00 in over twenty promissory note transactions. She was paid $572,500.22 interest at rates ranging from 12 to 39.66 percent. Following trial of the Trustee's claims against Boosalis, the district court granted the Trustee's motion for summary judgment against Papadimos and Kanios, concluding the record conclusively established that each of PCI's interest payments constituted "actual fraud" under MUFTA and these Defendants failed to establish the statutory affirmative defense to actual fraud. The court awarded the Trustee actual damages and prejudgment interest totaling $5,852,168.36 against Papadimos and $1,071,594.93 against Kanios.

All three Defendants appeal, raising numerous issues, many but not all of which overlap. Without consolidating the appeals, we heard oral arguments on the same day and now resolve the appeals in a combined opinion. On the major overlapping issue, we conclude the district court erred in applying the Supreme Court of Minnesota's controlling MUFTA decision in Finn v. Alliance Bank, 860 N.W.2d 638 (Minn. 2015), and the Minnesota law of void contracts. This requires reversing summary judgment against Papadimos and Kanios. In the Boosalis case, we likewise reverse and remand because the district erred in instructing the jury on the MUFTA elements of "good faith" and "reasonably equivalent value." In both cases, we conclude the district court erred in concluding that Minnesota rather than federal law governed the award of prejudgment interest. We reject Defendants' other arguments.

## I. Background

**A. Boosalis.** Boosalis first learned of Petters in 1995 when a friend said he was lending to Petters and suggested Boosalis do the same. At a meeting in San

Francisco, Petters claimed to be in the business of "diverting merchandise" -- purchasing discounted merchandise and selling it to large retailers like Sam's Club or Costco – and outlined his plan to build several retail stores. Thinking the business would be even more successful than Costco, Boosalis, after consulting his attorney, agreed to lend PCI approximately $50,000. PCI repaid that loan and a second loan in full. Boosalis continued lending on a regular basis, memorializing each loan in a promissory note and, in most transactions, a security agreement pledging as collateral the goods PCI would buy with the loan proceeds.[3] To maintain Petters's transaction facade, PCI's Vice President of Operations, Deanna Coleman, attached fake purchase orders and invoices to many promissory notes. Petters also built several stores around the Twin Cities area that Boosalis occasionally visited. But PCI primarily used the proceeds of new loans to repay interest and principal to earlier lenders.

As the lending continued, Boosalis "rolled" the principal of his outstanding notes when PCI repaid interest every 90 days, counting outstanding unpaid principal toward the principal of a new note. By the end of 1998, unpaid principal on loans to Boosalis totaled $2.1 million, with PCI paying over $460,000 in interest. The amount fluctuated but, at one point, Boosalis had as much as $3.1 million outstanding. Boosalis encouraged business associates, family members, and the "Boosalis Family Limited Partnership" to lend to PCI, becoming the point of contact for what PCI called the "California Group." When PCI needed money, its employees would call Boosalis, and he would connect them to a lender. In 2001, millions of dollars of PCI

---

[3]The Trustee repeatedly describes Boosalis as an "investor" who made "false profits." But that term is not accurate. An investment typically is an infusion of capital for the receipt of equity whereas Petters made use of loan-based financing to support his scheme. See Greenpond S., LLC v. Gen. Elec. Capital Corp., 886 N.W.2d 649, 651 n.2 (Minn. App. 2016); In re Petters Co., 495 B.R. 887, 892 & n.1 (Bankr. D. Minn. 2013). As Minnesota law governs, we will follow the lead of Greenpond and "use the term 'lender' to identify a person or entity that provided debt capital to Petters, 'loan' as identifying the extension of that capital, and 'creditors' when referencing all of Petters' lender-victims."

checks to Boosalis and his family bounced. Boosalis contacted Petters, who promptly paid the debt, and Boosalis loaned PCI another $500,000. Before that note was due, Petters said he had secured better financing and offered a new interest rate of 18 percent. Boosalis quit lending. By October 2001, PCI repaid him in full.

**B. Papadimos and Kanios.** Papadimos learned of the opportunity to make short-term loans to PCI's diverting business in 1997. He met with Petters at PCI headquarters in Minnesota and visited a warehouse filled with goods purchased by PCI for resale. Papadimos received assurances of PCI's legitimacy from its insurers, other references, and Minnesota government agencies. Thomas Hay, an attorney and adviser to Petters, told Papadimos that PCI's long-term plan was to progress from loans from individual investors to large credit facilities provided by institutional investors. Papadimos began making loans and, at his recommendation, Kanios began making loans to PCI through her 401(k) plan. Nearly every promissory note included a security agreement granting the lender a security interest in the goods to be purchased. Papadimos and Kanios stopped making loans in 2005 because PCI wished to transact only with institutional investors. PCI repaid their outstanding principal balances in full.

**C. The Litigation.** In September 2008, Deanna Coleman walked into the U.S. Attorney's office in Minneapolis and precipitated Petters's prosecution, the downfall of his $3.5 billion operation, PCI's bankruptcy, and this claw back litigation. Following eight years of Trustee-led case management, discovery, and motion practice before the bankruptcy court, the Boosalis case was transferred to the District of Minnesota in 2018, and the district court held the first trial in the Trustee claw back actions in Kelley v. Boosalis, D. Minn. No. 18-cv-00868.

Coleman was the Trustee's lead witness at the Boosalis trial. Coleman explained she solicited lenders for the scheme and fabricated purchase orders to make the loans appear legitimate. She would "always call the investor up and tell them it

was for some kind of deal," claiming PCI would use the loan to purchase "some kind of merchandise." Promissory notes accurately stated the terms of the loans, but the high interest rates, set by Petters, were not "tied to any economic reality." Coleman recalled Boosalis never requested any documents or conducted any investigation, even after PCI bounced "quite a few" checks, worth "[h]undreds of thousands" of dollars, in 2001. She specifically recalled offering Papadimos fraudulent transactions when PCI needed money "to do a certain deal." Besides purchase orders, Coleman falsified bank statements, wire transfers, and insurance policies.

The Trustee retained Theodore Martens as an expert forensic accountant to analyze PCI's finances. At the Boosalis trial, Martens testified PCI was insolvent from late 1996 to 2008; its liabilities always exceeded its assets. Martens's forensic analysis of each loan concluded that "the funds received from/sent to the Defendant[s] were part of the rolling churn of the Petters Ponzi scheme," not legitimate transactions. Boosalis funded payments to other lenders, while other lenders funded payments to Boosalis. Thus, opined Martens, Boosalis was "Ponzied." Martens found no evidence that funds associated with Defendants' loans flowed to Petters companies that conducted legitimate businesses. His revised analysis, described as "conservative," showed that PCI paid Boosalis a total of $3,307,090 in interest on principal loan balances totaling $5,340,000. In total, the parties called eight witnesses and introduced over 175 exhibits.

## II. The MUFTA Issue

In both cases, the Trustee seeks to avoid under "applicable law," MUFTA, the transfer of interest PCI paid to Defendants on outstanding promissory notes. 11 U.S.C. § 544(b)(1). MUFTA provides that a transfer made by a debtor is voidable if the transfer is tainted by actual fraud, defined as "actual intent to hinder, delay, or defraud any creditor of the debtor," or by constructive fraud, defined as a financially distressed debtor not "receiving a reasonably equivalent value in exchange for the

-7-

transfer or obligation." Minn. Stat. § 513.44(a); see Citizens State Bank Norwood Young Am. v. Brown, 849 N.W.2d 55, 60 & n.5 (Minn. 2014).[4] We focus this opinion on whether the interest payments constituted "actual fraud." Given our resolution of the actual fraud issues, we need not consider the Trustee's alternative claims of constructive fraud, though they will likely be relevant on remand.

**A. Actual Fraud.** The jury found that each PCI interest payment to Boosalis was made with intent "to hinder, delay, or defraud" PCI creditors. The district court adopted this as a conclusion of law in granting summary judgment against Papadimos and Kanios. "Because the intent to defraud creditors is rarely susceptible of direct proof," courts applying MUFTA and the uniform fraudulent transfer laws in other States often rely on circumstantial evidence -- known as "badges of fraud" -- to determine whether the debtor had the requisite fraudulent intent. Citizens State, 849 N.W.2d at 60; see Minn. Stat. § 513.44(b)(3), (9); Ritchie Capital Mgmt., 779 F.3d at 863. The trial and other sworn testimony of Coleman and Martens provided substantial evidence of PCI's overall fraudulent intent in conducting a twelve-year Ponzi scheme in which PCI used new loan proceeds to repay early lenders, rather than to finance legitimate transactions. Papadimos and Kanios argue the direct evidence was too generalized to support summary judgment and the circumstantial evidence was insufficient. They posit that a reasonable jury might decide that their loans and loan proceeds were tied to Petters entities that conducted legitimate business. But given the summary judgment record, this is "speculation and conjecture . . . insufficient to defeat summary judgment." Bloom v. Metro Heart Grp. of St. Louis, Inc., 440 F.3d 1025, 1028 (8th Cir. 2006).

---

[4]Whether there are unsecured PCI creditors with allowable claims on whose behalf the Trustee can seek avoidance is disputed by Boosalis, but not by Papadimos and Kanios. We reject Boosalis's contention in Part III, *infra*.

Given the overwhelming evidence of PCI's overall intent to operate a fraudulent Ponzi scheme, we will not disturb the jury's finding and the district court's conclusion regarding PCI's actual intent to hinder, delay, or defraud its creditors. However, the Trustee's evidence in both cases emphasized a "Ponzi churn" theory of fraudulent transfers that in our view was contrary to Minnesota law. MUFTA requires that each fraudulent transfer claim "be determined in light of the facts and circumstances of each case" on a "transfer-by-transfer" basis. Finn, 860 N.W.2d at 647. Therefore, we leave the actual fraud issue open for reconsideration and new evidence on remand.

**B. The Affirmative Defense to Actual Fraud:** MUFTA provides an affirmative defense to a claim of actual fraud under Minn. Stat. § 513.44(a)(1): "A transfer or obligation is not voidable under [§ 513.44(a)(1)] against a person that took in good faith and for a reasonably equivalent value." § 513.48. All Defendants asserted this affirmative defense. The Trustee stipulated that Papadimos and Kanios took in good faith. The jury found that Boosalis did not; he challenges the district court's jury instruction on that issue. All Defendants challenge the district court's interpretation of "reasonably equivalent value" under MUFTA. This critical issue also affects whether a transfer is avoidable under the constructive fraud provisions of § 513.44(a)(2). Therefore, we will first consider the reasonably equivalent value component of the actual fraud affirmative defense under Minnesota law.

**1. Reasonably Equivalent value -- Papadimos and Kanios.** In Finn, the Supreme Court of Minnesota rejected a broad "Ponzi-scheme presumption" adopted by many courts that have considered claw back actions under the fraudulent transfer provision in the federal Bankruptcy Code, 11 U.S.C. § 548, and § 544(b) claw back actions based on the Uniform Federal Transfer Acts adopted in other States.[5] The

---

[5]Claims under 11 U.S.C. § 548 are subject to a one-year statute of limitations, which is doubtless why the Trustee chose to proceed under § 544(b) in these cases.

Court refused to conclude as a matter of law "that a debtor operating a Ponzi scheme cannot receive reasonably equivalent value for the 'interest' or 'profits' it pays to investors." 860 N.W.2d at 649. Finn held, instead, that whether an individual transfer was made for reasonably equivalent value "depends on the facts and circumstances of each case." Id. at 650.

In the Boosalis trial, the district court instructed the jury that "[v]alue may be reasonably equivalent where the payment made to the investor satisfies a valid antecedent debt," but "[a]ny payment above the amount of the principal investment is not in satisfaction of a valid antecedent debt if it was made in furtherance of a fraud, enabled by a fraud, or paid on a dishonestly-incurred debt." Kelley v. Boosalis, No. 0:18-cv-00868, 2018 WL 6322631, at *2 (D. Minn. Dec. 3, 2018). In granting summary judgment against Papadimos and Kanios, the district court explained the premises underlying this instruction.

First, the district court concluded that, though the Supreme Court of Minnesota rejected the use of the Ponzi-scheme presumption adopted by many federal courts, Finn did not discard the "equity-driven bankruptcy law" on which the presumption was based. The equity-based decisions conclude that an investor who profits from a Ponzi scheme, even if an unwitting accomplice to fraud against other lenders or investors, does not have a contractual right to keep interest payments made as a direct result of that illegal scheme. See, e.g., Scholes v. Lehmann, 56 F.3d 750, 757 (7th Cir. 1995). This principle was not categorically rejected by the Court in Finn, the district court concluded. Rather, Finn held only that "any *legally enforceable* right to payment against the debtor is sufficient to qualify as an antecedent debt under MUFTA." 860 N.W.3d at 651 (emphasis added). Second, the court noted Minnesota cases stating that a contract that aims to deceive third parties is void as against public policy. In a Ponzi scheme, payment of interest using other investors' money plainly

---

See In re Carrozzella & Richardson, 286 B.R. 480, 483 n.3 (Bankr. D. Conn. 2003).

-10-

aims to deceive those other investors. Therefore, the contract is not legally enforceable under Minnesota law because it furthered the on-going fraud. Because Defendants "failed to adduce evidence showing that any one of their interest payments was *not* made in furtherance of a fraud, enabled by a fraud, or paid on dishonestly-incurred debt," no antecedent debt was satisfied by the interest payments, and Defendants did not provide reasonably equivalent value for the interest payments they received.[6]

**(a)** We agree with Defendants that the district court's analysis misinterpreted the unanimous decision of the Supreme Court of Minnesota in Finn.[7] In Finn, the receiver of a Ponzi-scheme operator's bankruptcy estate sought to claw back interest earned by a bank from a "participation interest" in a loan made by the Ponzi-scheme operator. See 860 N.W.2d at 642-43. The Court entered summary judgment *in favor of* the defendant transferee because it had provided reasonably equivalent value for the interest payments it received, namely, "satisfaction of the debt owed . . . under the participation agreement between the parties." Id. at 655. Consistent with Minn. Stat. § 513.43(a), the Court held that "the satisfaction of an antecedent debt can constitute reasonably equivalent value" and "any legally enforceable right to payment against the debtor is sufficient to qualify as an antecedent debt under MUFTA." 860 N.W.2d at 650, 651.

---

[6]This analysis avoided a critical holding in Finn: "[A]ny enforceable right to payment against the debtor is sufficient to qualify as an antecedent debt under MUFTA. . . . Without a legally enforceable contractual claim, any payment made to an investor beyond its principal investment is not for antecedent debt, and therefore cannot be in exchange for reasonably equivalent value." Finn, 860 N.W.2d at 651. Thus, Finn confirmed that, in defending a fraudulent transfer claim under MUFTA, a bona fide debt investor is in a stronger position than a bona fide equity investor.

[7]The Trustee successfully urged the district court not to certify this question to the Minnesota Supreme Court.

-11-

The district court's global approach to the issues of antecedent debt and reasonably equivalent value is contrary to the clear directive in Finn that each fraudulent transfer claim "be determined in light of the facts and circumstances of each case" on a "transfer-by-transfer" basis. 860 N.W.2d at 647. The transfers at issue were payments of interest owed to Defendants on loans reflected by promissory notes and security agreements. Concluding that each loan was void *ab initio* because PCI was engaged in a Ponzi scheme, and therefore each periodic interest payment was not for an antecedent debt, simply repackages the Ponzi-scheme presumption that Finn refused to adopt as Minnesota law. Cf. Stoebner v. Opportunity Fin., LLC, 909 F.3d 219, 226 (8th Cir. 2018). Finn expressly rejected the basis for equity-based decisions the district court followed that were not governed by Minnesota law:

> [E]quality among a debtor's creditors, even if they are victims of a Ponzi scheme, is *not* the purpose of MUFTA. Rather, its purpose is to prevent debtors from putting property which is available for the payment of their debts beyond the reach of their creditors. . . . [P]ayment of an honest debt is not fraudulent under the general statutes against fraudulent conveyances, although it operates as a preference. . . . Mere preferences are different from fraudulent transfers because the basic object of fraudulent conveyance law is to see that the debtor uses his limited assets to satisfy *some* of his creditors; it normally does not try to choose among them. Boston Trading Grp., Inc. v. Burnazos, 835 F.2d 1504, 1509 (1st Cir. 1987) (Breyer, J.).

Id. at 652-53 (emphasis in original; cleaned up).

Consistent with other equity-based decisions, the district court concluded that each PCI loan transaction was void as against public policy because it furthered the Ponzi scheme, and each preferential interest payment was a fraudulent transfer under MUFTA because it was paid with money stolen from other investors. See Janvey v. Brown, 767 F.3d 430, 441-42 (5th Cir. 2014) (certificate of deposit lending contracts with Ponzi-scheme operator "void" because recovery of promised returns in excess of investor's undertaking furthers debtor's fraudulent scheme at the expense of other

-12-

investors, applying Tex. UFTA); <u>Donell v. Kowell</u>, 533 F.3d 762, 770 (9th Cir. 2008) ("[W]inners in the Ponzi scheme, even if innocent of any fraud themselves, should not be permitted to enjoy an advantage over later investors sucked into the Ponzi scheme who were not so lucky," applying Cal. UFTA, quotation omitted). This analysis sweeps as broadly as the Ponzi-scheme presumption <u>Finn</u> rejected. <u>See</u> 860 N.W.2d at 651-53.

**(b)** We agree with the district court that <u>Finn</u> limited its antecedent debt analysis to "legally enforceable" contracts and "honest debt," leaving open the question whether recovery of "profits" by early investors in a Ponzi scheme may be so entangled in the debtor's fraud as to be void *ab initio* under Minnesota law, in which case there is no antecedent debt that was satisfied by the debtor's payments at issue. However, we conclude that the Supreme Court of Minnesota would rule, if faced with this precise issue, that the promissory notes at issue in this case were not void *ab initio* under Minnesota law. <u>See</u> <u>EMC Ins. Cos. v. Entergy Ark., Inc.</u>, 924 F.3d 483, 485 (8th Cir. 2019) (standard of review).

In <u>Finn</u>, the Court noted that courts applying the Ponzi-scheme presumption "effectively deem a contract between the operator of a Ponzi scheme and an investor to be unenforceable as a matter of public policy." <u>Id.</u> at 651. The Court rejected that categorical approach and, having "set aside" the presumption, granted summary judgment in favor of transferee Alliance Bank because it received interest payments at a "commercially reasonable rate of return" on a loan that was "real and not oversold." Therefore, satisfaction of debtor's antecedent debt was reasonably equivalent value under MUFTA. <u>Id.</u> at 655-56.

Under Minnesota law, a contract is void against public policy only if "it is injurious to the interests of the public or contravenes some established interest of society," or if "illegality has so tainted the contract that enforcing the contract would be against public policy." <u>Isles Wellness, Inc. v. Progressive N. Ins. Co.</u>, 725 N.W.2d

90, 93 (Minn. 2006) (cleaned up). This is an extraordinary measure that "should be only exercised in cases free from doubt." Id. Whether a contract is void as against public policy is an issue of law. Id. at 92.

In concluding that *every* loan transaction between PCI and Defendants was legally unenforceable, the district court relied on the principle "that a contract is void which has for its object the practice of deception or fraud upon a third party." Torpey v. Murray, 101 N.W. 609, 610 (Minn. 1904); accord Geo. Benz & Sons v. Hassie, 293 N.W. 133, 136 (Minn. 1940); Horbach v. Coyle, 2 F.2d 702, 706 (8th Cir. 1924). However, in these cases, *both* parties entered into the contract at issue with the purpose of deceiving a third party. For example, in Torpey, where the plaintiff agreed with the defendant to manipulate a third party into purchasing an asset from the plaintiff in exchange for an illegal kickback, the plaintiff's contractual claim to recover the kickback was rejected on this ground. 101 N.W. at 610. Here, there is no evidence that Papadimos and Kanios, whose good faith the Trustee has conceded, worked with PCI to deceive other lenders or investors. Neither the Trustee nor the district court cited a Minnesota case that invalidated a contract based on one party's unilateral acts of deception. In the case cited by the Trustee at oral argument, State v. Tauer, the Court held that a contract *between* rival newspapers to rig a county bidding process was void against public policy because it unlawfully destroyed economic competition. 227 N.W. 499, 500 (Minn. 1929).

The Trustee asserted and the district court concluded that the promissory notes are void because they enabled an on-going fraud, an illegal purpose. But they cite no Minnesota case invalidating an otherwise valid contract on this ground, and there are many cases to the contrary. In Johnstown Land Co. v. Brainerd Brewing Co., for example, the Supreme Court of Minnesota held that "mere knowledge by the lender of [the borrower's unlawful] purpose will not bar his recovery of the amount loaned." 172 N.W. 211, 212 (Minn. 1919). In Anheuser-Busch Brewing Ass'n v. Mason, the Court refused to void a purchase contract for beer because the beer would be

-14-

consumed by patrons of a brothel, noting that a contract "is not void simply because there is something immoral or illegal in its surroundings or connections." 46 N.W. 558, 558-59 (Minn. 1890). Similarly, in Hart Pubs. v. Kaplan, the Court held that a contract for the sale of tickets for an illegal lottery was not void; "bare knowledge of the purpose for which the tickets could be used was not enough to raise a valid defense of illegality." 37 N.W.2d 814, 818-19 (Minn. 1949).

The promissory notes held by Defendants fit comfortably within this group of decisions. Defendants supplied PCI financing, not knowing PCI would used the loan proceeds to further a fraudulent Ponzi scheme rather than to purchase merchandise in which Defendants were promised a security interest. Defendants received interest payments to which they were contractually entitled. The fact that the interest was paid out of PCI's Ponzi churn was immaterial to the validity of the promissory notes. Though the district court "decline[d] to imply a strict *mens rea* requirement" from prior cases, that decision was squarely contrary to well established Minnesota law:

> Even if it be granted that the record might warrant the drawing of an inference that [the transferor] was actuated by an actual fraudulent intent, we find nothing which would permit such an intent to be found in the grantee. *To be entitled to have a deed upon fair consideration adjudged void as to a creditor of the insolvent grantor it is necessary to prove actual intent to defraud on the part of both grantor and grantee.*

Watson v. Goldstein 219 N.W. 550, 551 (Minn. 1928); see Skinner v. Overend, 252 N.W. 418, 419 (Minn. 1934); Petersdorf v. Malz, 162 N.W. 474, 477 (Minn. 1917).

The district court thus erred as a matter of law in declaring the promissory notes void and incapable of creating legally enforceable antecedent debts that would provide reasonably equivalent value for the interest payments Defendants received. Since the grant of summary judgment rejecting the actual fraud affirmative defense of Papadimos and Kanios turned on this determination, summary judgment must be

reversed. On their face, the secured promissory notes held by Defendants were valid and enforceable contracts -- "honest debts," as described in governing Supreme Court of Minnesota opinions -- in which case interest payments Defendants received satisfied PCI's antecedent debts. Whether those payments were nonetheless not received "for a reasonably equivalent value" under MUFTA must now be determined by the district court on remand.

**2. Reasonably Equivalent value -- Boosalis.** On appeal, Boosalis challenges Jury Instruction 18, which defined "reasonably equivalent value" for the jury:

> Value may be reasonably equivalent where the payment made to the investor satisfies a valid antecedent debt. *Any payment above the amount of the principal investment is not in satisfaction of a valid antecedent debt if it was made in furtherance of a fraud, enabled by a fraud, or paid on a dishonestly-incurred debt.* If you find that an interest payment made by Petters Company, Inc. to Mr. Boosalis was made in furtherance of a fraud, enabled by a fraud, or paid on dishonestly incurred debt, then that payment does not satisfy a valid antecedent debt, and is not for reasonably equivalent value.

We have explained why the italicized portion of this instruction did not fairly and adequately instruct the jury as to the substantive law under MUFTA. That error does not resolve Boosalis's appeal, however, because the jury also found that he did not act in good faith, the other component of the actual fraud affirmative defense. We turn next to that issue.

**3. Good Faith -- Boosalis.** On appeal, Boosalis challenges Jury Instruction 17, which addressed the good faith element of his affirmative defense to actual fraud avoidance:

> To determine whether Mr. Boosalis received a particular payment from Petters Company, Inc. in good faith, you must determine (1) whether

Mr. Boosalis was on inquiry notice of Petters Company, Inc.'s insolvency or fraud; and, if so, (2) whether Mr. Boosalis conducted a diligent investigation.

Mr. Boosalis was on inquiry notice if he had sufficient facts, or sufficient red flags existed, to cause a reasonable person to question whether Petters Company, Inc. was insolvent or paying money to Mr. Boosalis for a fraudulent purpose. *Sufficient facts or red flags may include delinquent payments, reversed checks, relatively high interest rates on loans, and a lack of formal paperwork surrounding business transactions.* The presence of such signs must place a reasonable person on inquiry notice and require him or her to diligently investigate.

If you find Mr. Boosalis was not on inquiry notice at the time he received a particular payment from Petters Company, Inc., then Mr. Boosalis has established the element of good faith with respect to that particular payment. If you find Mr. Boosalis was on inquiry notice at the time he received a particular payment from Petters Company, Inc., you must determine whether Mr. Boosalis conducted a diligent investigation as to the facts or red flags that placed him on inquiry notice and whether his investigation was reasonable under the circumstances. If you find Mr. Boosalis did not conduct a diligent investigation that was reasonable under the circumstances, then Mr. Boosalis has failed to establish the element of good faith. If you find that Mr. Boosalis did conduct a diligent investigation that was reasonable under the circumstances, then Mr. Boosalis has established the element of good faith.

(Emphasis added.)

**(a)** The Trustee argues Boosalis waived this objection before the district court. We disagree. At the instructions conference, counsel objected:

COUNSEL: Your Honor, I didn't have any issues up until Instruction Number 16.[8]  If we could go to that on page 12.

THE COURT: 16.  Good faith, yep.

COUNSEL: Yes, Your Honor.  If you go to the second paragraph, we would ask that the language starting with "sufficient facts or red flags may include delinquent payments, reversed checks, relatively high interest rates on loans, and lack of formal paperwork surrounding business transactions."  I would ask that that language be stricken.

THE COURT: And why is that?

COUNSEL: I think it's prejudicial here, Your Honor.  I mean, there could be a list, you know, a thousand items long.  The problem I have with this is it includes basically, you know, all of the issues that are present here in this case.  And I think it's kind of an all or nothing where if we're going to list these red flags, you know, it can't just be these few.  So, you know, I would just prefer that we take that language out completely.

THE COURT: Okay.  Do you think it's an incorrect statement?

COUNSEL: Your Honor, I don't -- I'm not going to argue that it's an incorrect statement.  Again, I think it's context.  I think if you're going to put a list in, this list is highly prejudicial because it basically lays out a few elements and all the elements are what are argument in this case.  If we're going to do a list, I would prefer that we have an exhaustive list.  What that would look like I don't know, but it would certainly be more than just this.  And in light of that and I think the confusion it would cause, I would just like this language stricken.  That's my request.

---

[8]The instructions were renumerated after the charge conference, such that Jury Instruction 16 became Jury Instruction 17.

Counsel renewed that objection prior to closing arguments and the court's final instructions to the jury. Even correct statements of the law can mislead the jury if they unduly emphasize a matter favorable to a party's case. See Rosebud Sioux Tribe v. A & P Steel, Inc., 733 F.2d 509, 518-19 (8th Cir.), cert. denied, 469 U.S. 1072 (1984). That was the objection made, and counsel explained it sufficiently to preserve the error for appellate review. See Fed. R. Civ. P. 51; Bauer v. Curators of Univ. of Missouri, 680 F.3d 1043, 1044-45 (8th Cir. 2012); Brown v. Sandals Resorts Int'l, 284 F.3d 949, 953 n.6 (8th Cir. 2002).

**(b)** While a district court has broad discretion in formulating jury instructions, it "must be careful if it intends to tie in principles of law to the facts." Vanskike v. ACF Indus., Inc., 665 F.2d 188, 202 (8th Cir. 1981), cert. denied, 455 U.S. 1000 (1982). "An instruction is argumentative if it does not include all the elements of the doctrine, or singles out the testimony of one witness while disregarding other relevant evidence, or unduly highlights certain features of a case." Id. at 201-02 (citations omitted); see Caviness v. Nucor-Yamato Steel Co., 105 F.3d 1216, 1221-22 (8th Cir. 1997). Such instructions "effectively require[] unjustified commentary on the evidence" and are "virtually verdict-directing in their character," in contrast to more preferable, "neutral instruction[s] directing the jury to consider such factors." Cent. Microfilm Serv. Corp. v. Basic/Four Corp., 688 F.2d 1206, 1219 (8th Cir. 1982), cert. denied, 459 U.S. 1204 (1983); compare Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 327 F.3d 771, 782-83 (8th Cir. 2003) (approving an instruction listing "hypothetical examples" of a non-hostile work environment), cert. denied, 540 U.S. 1106 (2004); Nat'l Auto. Trading Corp. of China v. Pioneer Trading Co., 46 F.3d 842, 843-44 (8th Cir. 1995) (approving an instruction listing facts that "tend to establish" abuse of corporate privilege).

Jury Instruction 17 was that type of error. It singled out facts most favorable to the Trustee. Worse yet, it stated that, if the jury found the presence of such signs, it "must" find that Boosalis was on inquiry notice, in effect, a directed verdict on a

critical element of the good faith issue. Good faith is not defined in MUFTA. See Minn. Stat. § 513.41. The term has no recognized meaning under the Uniform Fraudulent Transfers Act. See For Your Ease Only, Inc. v. Calgon Carbon Corp., 560 F.3d 717, 721 (7th Cir. 2009); UFTA § 8 cmt. (1) (Unif. L. Comm'n 1984); cf. Kansas City Power & Light Co. v. Ford Motor Credit Co., 995 F.2d 1422, 1430 (8th Cir. 1993) ("What good faith means depends on the situation in which the term is used."). By singling out "signs" favorable to the Trustee and then instructing that those facts are "sufficient," the instruction confused facts that *support* a finding with facts that *require* it in every case.

**(c)** Not every erroneous instruction results in a new trial. We reverse only if the error affected the substantial rights of the parties. See Fed. R. Civ. P. 61. There is no prejudice if the evidence was "overwhelming." Vanskike, 665 F.2d at 203. Here, the impact of the error in Instruction 17 must be considered in combination with the error in Instruction 18 on the issue of reasonably equivalent value, and with the way in which the Trustee relied on the combined errors in his final argument.

As we explained in Part II.B., the district court erred in instructing the jury in Instruction 18 that any payment of interest on PCI's promissory notes "is not in satisfaction of a valid antecedent debt if it was made in furtherance of a fraud, enabled by a fraud, or paid on a dishonestly-incurred debt." Relying on this instruction, the Trustee declared in closing argument:

> PCI was a Ponzi scheme. . . . The nature of a Ponzi scheme is that PCI defrauds new investors to pay old investors, right? It's the churn. And Gus Boosalis was in the churn. He was defrauded. His money was taken and used to pay old investors, and then later he was paid with money that was stolen from new investors.

\*   \*   \*   \*   \*

-20-

These promissory notes were a tool of fraud. They aren't legitimate contracts . . . . These notes were meaningless.

\* \* \* \* \*

So let's think about what that means. The truth is for four years . . . Gus Boosalis invested millions of dollars without a guaranty [from Petters] and without doing any diligence. That's not good faith. The guaranty didn't matter. The money did.

\* \* \* \* \*

You see . . . red flags going up, between January 3rd, 2001, and April 16th, 2001, all those [PCI payments] are bad checks. $3,383,500 in bad checks to the Boosalis family, and Gus Boosalis does nothing except ask that the checks be made good.

And then what does he do next? He invests another half million dollars. That's not good faith.

\* \* \* \* \*

You've heard the evidence . . . . $3.5 million. That didn't come from compensation. That didn't come from commissions. That came from the Ponzi scheme. . . . That's money that was stolen from other investors. It was used to pay Gus Boosalis. That's . . . what we're asking that you award in a verdict today.

The effect of these instructions and this closing argument is that the jury was invited to find that years of interest payments were actual fraudulent transfers based on a Ponzi presumption that is contrary to MUFTA as construed in Finn. The inquiry notice issue as argued was that Boosalis should have inquired *before making loans* reflected by promissory notes that were facially valid under Minnesota law. But the alleged fraudulent transfers were payments of interest due on those notes. Left unaddressed by the Trustee's argument and the district court's instructions is whether

the holder of a promissory note has an inquiry duty under MUFTA, before accepting interest payments on a presumptively valid antecedent debt that will reduce the debtor's total liabilities, and if so, what reasonable inquiry is required.

Under Minnesota law as construed in Finn, MUFTA, including its actual fraud affirmative defense, requires proof on a transaction-by-transaction basis. Unlike the preferential transfer provisions of the Bankruptcy Code, MUFTA "does not prohibit a debtor from making a preferential transfer in favor of one bona fide creditor over another, so long as *the transfer* is not fraudulent." 860 N.W.2d at 647, 653. Enabled by the district court's instructions, the Trustee argued for a verdict contrary to these principles. The distinction was cogently explained by Judge (now Justice) Breyer, construing Massachusetts fraudulent conveyance law in Boston Trading, a case cited favorably in Finn, 860 N.W. 2d at 653:

> Suppose that [PCI] obtain[s] C's money through dishonest means (larceny, fraud, etc.) and use[s] it to pay a debt that [PCI] owe[s] Boosalis], a transferee who knows of, *but did not participate in* [PCI's] dishonesty. Does [Minn. Stat. § 513.44(a)(1)] permit C to recover its money from [Boosalis]? We think . . . not.
>
> [W]e have found no modern case . . . that has found a fraudulent conveyance in such circumstances. That is not surprising, for the fraud or dishonesty in this example concerns, not [PCI's] transfer to [Boosalis], but *the manner in which the original debt to C arose*. Fraudulent conveyance law is basically concerned with *transfers* that "hinder, delay or defraud" creditors; it is not ordinarily concerned with how such debts were created.

835 F.2d at 1510 (emphasis in original); accord In re Sharp Int'l Corp. 403 F.3d 43, 56 (2d Cir. 2005) ("The fraud alleged . . . relates to the manner in which Sharp obtained new funding from the Noteholders, not Sharp's subsequent payment of part

of the proceeds to State Street. . . . [which] was at most a preference between creditors and did not 'hinder, delay, or defraud either present or future creditors.'").

In these circumstances, the district court's instruction errors "affected [Boosalis's] substantial right" to a fair trial of his affirmative defense. It may well be that Boosalis did not take some or all of the interest payments he received over a multi-year period "in good faith and for a reasonably equivalent value." Minn. Stat. § 513.48(a). But that must be determined at a new trial.

### III. The Predicate Creditor Issue.

The Bankruptcy Code authorizes the Trustee to avoid a transfer of the debtor "that is voidable" by a creditor identified in 11 U.S.C. § 544(b)(1), commonly referred to as a "predicate creditor." We have interpreted this provision to require the Trustee to "(1) identify an existing creditor; (2) with an allowable claim; (3) who under non-bankruptcy law could avoid the transfer, at least in part." In re DLC, Ltd., 295 B.R. 593, 601-02 (B.A.P. 8th Cir. 2003), aff'd sub nom. Stalnaker v. DLC, Ltd., 376 F.3d 819 (8th Cir. 2004). These requirements "have been discussed at length by various courts." In re Goodspeed, 535 B.R. 302, 306 & n.9 (Bankr. D. Minn. 2015) (collecting cases).

In 2001, PCI began transitioning from individual lenders to large institutions. In 2008, PCI borrowed $60 million from Interlachen Harriet Investments, Limited ("Interlachen"), a Twin Cities hedge fund. On appeal, Boosalis argues the district court erred in ruling as a matter of law that Interlachen was a "predicate creditor." Boosalis does not deny that Interlachen is an existing creditor with a claim under MUFTA that *could* avoid the transfers at issue. But he argues that Interlachen is not, at least as a matter of law, an unsecured creditor with an *allowable* fraudulent transfer claim based on actual fraud, because the claim would be barred by MUFTA's statute

-23-

of limitations -- within six years of "the discovery . . . of the facts constituting the fraud."  Minn. Stat. § 541.05, subd. 1(6); Finn, 860 N.W.2d at 658.

For a claw back claim under 11 U.S.C. § 544(b)(1), the Trustee must prove "that his predicate creditor did not know of or discover the fraud . . . at any time until within the six years before the date on which the bankruptcy petition was filed."  In re Petters Co., 495 B.R. at 9004.  The district court concluded that Interlachen could not have had knowledge of the Ponzi scheme fraud more than six years before that date because Interlachen was not formed until 2008.  Reviewing this issue *de novo*, we agree.  Anderson v. Indep. Sch. Dist., 357 F.3d 806, 809 (8th Cir. 2004) (standard of review).

Boosalis argues that an Interlachen executive, Lance Breiland, may have noticed "red flags" more than six years before the bankruptcy filing in 2008.[9]  Under Minnesota law, a corporation can be charged for statute of limitations purposes with constructive knowledge of material facts that its officers or agents acquire.  See Day Masonry v. Indep. Sch. Dist. 347, 781 N.W.2d 321, 334 (Minn. 2010); Travelers Indem. Co. v. Bloomington Steel & Supply Co., 718 N.W.2d 888, 895-96 (Minn. 2006).  In some circumstances, knowledge an agent acquired before the agency relationship will "be deemed notice to his principal, and will bind him."  PHL Variable Ins. Co. v. 2008 Christa Joseph Irrevocable Tr., 970 F. Supp. 2d 932, 944 (D. Minn. 2013), aff'd, 782 F.3d 976 (8th Cir. 2015), quoting Lebanon Sav. Bank v. Hallenbeck, 13 N.W. 145, 147 (Minn. 1882); see 3 Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 799 (rev. ed. 2018).  But Boosalis has cited no authority providing that a principal may be charged, for statute of limitations

---

[9]The district court observed that Breiland's cross-designated deposition testimony concerned his work with Interlachen after 2002, within the six-year limitations period.

purposes, with knowledge an agent acquired at a time when neither the agency relationship *nor the principal itself* existed. We decline to adopt such a rule.

Alternatively, Boosalis argues that deciding this issue as a matter of law deprived him of the opportunity to cross examine Interlachen representatives on whether they noticed "red flags," and whether the Trustee acted inconsistently in treating Interlachen's claim as valid while seeking to claw back interest PCI paid to him. But the predicate creditor issue turns on whether Interlachen discovered PCI's Ponzi scheme fraud more than six years before the bankruptcy filing. As Boosalis did not identify disputed facts regarding that issue, the district court properly ruled on the issue as a matter of law.

## IV. Personal Liability of Kanios.

Kanios argues that she is not personally liable to the Trustee for any fraudulent transfers because PCI paid all interest to her 401(k) plan and therefore she was not the "transferee" or "the entity for whose benefit such transfer was made." 11 U.S.C. § 550(a). As she was not the beneficiary of the transfer, the transfer was not quantifiable and was not accessible to her. See Bonded Fin. Servs., Inc. v. Eur. Am. Bank, 838 F.2d 890, 893-96 (7th Cir. 1988). The district court properly rejected this argument, which Kanios did not raise until the summary judgment motion proceedings. On appeal, Kanios further argues for the first time that the Trustee could recover from her only through a claim against the plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), and the Trustee lacks standing under ERISA.

**A.** In rejecting this contention, the district court recognized that it is plainly contradicted by the facts. As the sole beneficiary of the plan, Kanios received PCI interest payments the *instant* the plan received them. The payments were quantified in the lawsuit. The proceeds were fully accessible to Kanios at any time, albeit

-25-

subject to a ten percent tax penalty if withdrawn before she reached early retirement age. See 26 U.S.C. § 72(t)(1), (2)(A)(i). That a *prudent* 401(k) plan beneficiary would not incur an early withdrawal penalty did not make the money inaccessible at the time of the fraudulent transfer. See Haury v. Comm'r, 751 F.3d 867, 868-69 (8th Cir. 2014). That the plan may invest the proceeds before withdrawal did not mean the initial deposit was not quantifiable. The interest payments increased the funds available for investing in her plan account by $572,500.22. Therefore, Kanios was the transferee of those payments from whom the creditor may recover under MUFTA. See Minn. Stat. § 513.48(b)(1)(i).

**B.** We normally would not consider Kanios's ERISA argument because it is raised for the first time on appeal. In any event, it is without merit. Whether the Trustee has standing to bring an action under ERISA's remedial provisions because the Trustee is not a plan participant, beneficiary, fiduciary, or the Secretary of Labor is irrelevant. See 29 U.S.C. § 1132(a). The Trustee does not need standing to sue the 401(k) plan because the Trustee is not seeking a remedy under ERISA's "comprehensive civil enforcement scheme." Aetna Health, Inc. v. Davila, 542 U.S. 200, 208 (2004) (quotation omitted). The Trustee seeks to claw back assets received by the plan, asserting a claim under the federal Bankruptcy Code. Kanios cites no case in which ERISA remedies preempted a *federal* cause of action. See In re Target Corp. Sec. Litig., 275 F. Supp. 3d 1063, 1067 (D. Minn. 2017) (considering claims brought by plaintiffs under both ERISA and federal securities law).

## V. The Prejudgment Interest Issue

Finally, Defendants challenge the district court's award of prejudgment interest. In both cases, the court concluded that Minnesota rather than federal law governed the award and therefore it was *required* to apply a 10 percent per annum rate from the "commencement of this action," namely, from September 23, 2010, the date the Summons was issued, to the present. See Minn. Stat. § 549.09, subd. 1(b),

(c)(2). This resulted in awards increasing the total judgment against Boosalis by over 80 percent and the total judgment against Papadimos and Kanios by 47 percent. Whether Minnesota law governs is an issue of law reviewed *de novo*. Though we are reversing both final judgments and remanding for further proceedings, we will address the issue because it may be relevant on remand. We will not address Defendants' alternative argument that, even if Minnesota law governs the award of prejudgment interest, the district court abused its discretion by awarding prejudgment interest under the circumstances in these cases.

In general, prejudgment interest presents "a question of federal law where the cause of action arises from a federal statute," Mansker v. TMG Life Ins. Co., 54 F.3d 1322, 1330 (8th Cir. 1995), while "[i]n a diversity case, the question of prejudgment interest is a substantive one, controlled by state law," Emmenegger v. Bull Moose Tube Co., 324 F.3d 616, 624 (8th Cir. 2003). Whether the Trustee's avoidance action under 11 U.S.C. § 544(b)(1) is a state or federal cause of action for purposes of prejudgment interest is a question we have not previously addressed that has divided other courts. See Harris Winsberg and Karen Visser, A Survey on Prejudgment Interest Awards in Preference and Fraudulent Conveyance Avoidance Actions, 24 Norton J. Bankr. L. & Prac. n.45 (2015) (comparing cases).

"In fraudulent transfer actions, there is a distinction between avoiding the transaction and actually recovering the property or the value thereof." In re Int'l Admin. Servs., Inc., 408 F.3d 689, 703 (11th Cir. 2005). The Trustee's authority to recover money judgments against Defendants is conferred by 11 U.S.C. § 550. Section 550(a) lists seven avoidance provisions in the Code, including § 544, and provides that "the trustee may recover, for the benefit of the estate, the property transferred or, of if the court so orders, the value of such property." See, e.g., In re H & S Transp. Co., 939 F.2d 355, 358 (6th Cir. 1991). Because "Section 544(b)(1) says nothing about recovery . . . . [t]he recovery of fraudulent transfers is authorized by *federal* law -- Section 550(a)(1)." In re DBSI, Inc., 869 F.3d 1004, 1015 (9th Cir.

2017). Therefore, § 550 provides the entire basis for the Trustee to recover once the transfer has been avoided through one of the provisions listed in § 550(a), such as § 544(b)(1). See In re DLC, Ltd., 295 B.R. at 602.

In concluding the Trustee's action is governed by state law, the district court relied principally on In re Keefe, 401 B.R. 520 (B.A.P. 1st Cir. 2009). Keefe held that while § 550 "identifies the entities from whom recovery may be made," Massachusetts fraudulent transfer law provided "the substantive basis for the judgment." 401 B.R. at 527. "Therefore, as state law is the substantive basis for the fraudulent transfer judgment, the bankruptcy court should have looked to state law to determine the applicable rate of prejudgment interest." Id.; accord In re Agric. Rsch. & Tech. Grp., 916 F.2d 528, 541 (9th Cir. 1990) ("Hawaii law regarding prejudgment interest is applicable via 11 U.S.C. § 544(b).").

We conclude the decision in Keefe reflects a misunderstanding of how § 544 and § 550 interact because the court ignored the Bankruptcy Code's separation of avoidance and recovery. "This demarcation . . . is underscored by § 550(f), which places a separate statute of limitations on recovery actions." Int'l Admin., 408 F.3d at 703; see H.R. Rep. No. 595, 95th Cong. 1st Sess. 375 (1977) ("Section 550 . . . enunciates the separation between the concepts of avoiding a transfer and recovering from the transferee."); In re Acequia, Inc., 34 F.3d 800, 809 (9th Cir. 1994). MUFTA provided the substantive basis for Defendants' fraudulent transfer liability but not the right to a recovery to which the Trustee was therefore entitled. As the source of recovery, § 550 was the *source* for the award of prejudgment interest:

> The right to recover prejudgment interest on a fraudulent conveyance arises from that language in [11 U.S.C.] § 550(a) which allows a trustee to recover "the value" of the transferred property. To obtain such value, the plaintiffs need some accommodation for the time value of money. Prejudgment interest fulfills this purpose.

<u>In re CNB Intern., Inc.</u>, 440 B.R. 31, 46 (W.D.N.Y 2010) (quotation omitted).  For this reason, the district court erred in awarding prejudgment interest under Minnesota rather than federal law.

By holding that state law applies to the award of prejudgment interest through 11 U.S.C. § 544(b), the district court also endorsed what we see as an expansion of the <u>Erie</u>[10] doctrine.  Application of state law turns on diversity or supplemental *jurisdiction*.  <u>Emmenegger</u>, 324 F.3d at 624 & n.9.  "The award of prejudgment interest in a diversity action is determined by referring to the law of the state in which the *cause of action* arose."  <u>Kisco Co. v. Verson Allsteel Press Co.</u>, 738 F.2d 290, 296 (8th Cir. 1984) (emphasis added).  Here, it is undisputed that the district court's jurisdiction was based on a federal question, not on diversity or supplemental jurisdiction, leaving no basis for applying state law other than § 544(b).  Proceedings to avoid fraudulent conveyances under § 544 are "core proceedings arising under title 11" that the district court may delegate to a bankruptcy court judge for final disposition.  28 U.S.C. § 157(b)(1), (b)(2)(H).  As the Ninth Circuit has bluntly stated, § 544(b)(1) "permits a trustee to pursue a *federal* cause of action in bankruptcy court."  <u>DBSI</u>, 869 F.3d at 1015; <u>see</u> <u>In re Weinberg</u>, 153 B.R. 286, 290-91 (Bankr. D.S.D. 1993).  "[A] case arises under federal law when federal law creates the cause of action asserted."  <u>Gunn v. Minton</u>, 568 U.S. 251, 257 (2013).

That the Trustee's claim under § 544 is a federal cause of action compels the application of federal law to an award of prejudgment interest.  In <u>Monessen Sw. Ry. v. Morgan</u>, for example, the Supreme Court concluded that Pennsylvania courts erred in treating the availability of prejudgment interest in Federal Employers' Liability Act actions as a matter of state rather than federal law:

---

[10]<u>Erie R. Co. v. Tompkins</u>, 304 U.S. 64 (1938).

-29-

> The proper measure of damages under the FELA is inseparably connected with the right of action, and therefore is an issue of substance that must be settled according to general principles of law as administered in the Federal courts. . . . The question of what constitutes 'the proper measure of damages' under the FELA necessarily includes the question whether prejudgment interest may be awarded to a prevailing FELA plaintiff.

486 U.S. 330, 335 (1988) (quotation omitted).  That logic applies here.  Since the recovery of fraudulently transferred property and the attachment of prejudgment interest are "inseparably connected with the [federal] right of action" created by the Bankruptcy Code, prejudgment interest is governed by federal standards in determining the proper measure of damages.

## VI. Conclusion

For the foregoing reasons, the judgments of the district court are reversed and the cases are remanded for further proceedings not inconsistent with this opinion. The Trustee's motion to remand to clarify that Kanios is personally liable is denied as moot.

KELLY, Circuit Judge, concurring in part, dissenting in part.

I respectfully dissent from Section II of the court's opinion.  I am not persuaded that the district court's rulings and jury instructions are at odds with Finn v. Alliance Bank, 860 N.W.2d 638 (Minn. 2015).

### A.

In Finn, the Minnesota Supreme Court rejected the so-called "Ponzi-scheme presumption," which "allows a creditor to bypass the proof requirements of a

-30-

fraudulent-transfer claim by showing that the debtor operated a Ponzi scheme and transferred assets in furtherance of that scheme." Id. at 646 (cleaned up).  The court reasoned that the "asset-by-asset and transfer-by-transfer nature" of the inquiry required under MUFTA demands that creditors must establish the elements of fraudulent transfer "with respect to each transfer," instead of relying on a presumption rooted in "the form or structure of the entity making the transfer."  Id. at 647.

I do not agree that the district court in effect applied the Ponzi-scheme presumption rejected by Finn.  Instead, the district court diligently examined the "overwhelming" direct evidence of PCI's fraudulent intent and grappled with the difficult question of whether each of the specific interest payments that lenders received was "for a reasonably equivalent value."  Ante at 9; see Minn. Stat. § 513.48(a).

In making this inquiry, the district court relied on testimony from Coleman, who drafted the notes, security agreements, and purchase orders underpinning the challenged transfers.  Kelley v. Kanios, 383 F. Supp. 3d 852, 871 (D. Minn. 2019). She testified that "every purchase order that an investor received or invested in was fake."  Id. (cleaned up).  Because "every" purchase order PCI sent investors was "fake," Coleman testified, investors "never invested in a real transaction."  Id. at 861. The district court also cited testimony from Martens, whose forensic accounting team "scoured" PCI's records to "analyze[ ] each transfer at issue."  Id. at 863, 871.  He explained that none of the lenders' loans or interest payments were rooted in the purchase or sale of real merchandise.  Id. at 863.  At summary judgment, neither Kanios nor Papadimos came forward with evidence to the contrary.

As for the jury instructions in Boosalis, nothing in their language departs from the transfer-specific inquiry required under MUFTA.  See Finn, 860 N.W.2d at 647. Consistent with Finn, the challenged instructions referred to "individual transfers, rather than a pattern of transactions."  Id; see ante at 16–17 (reciting jury instructions

-31-

referring to transfers in the singular form, for example, "a particular payment from [PCI]," "a payment," and "an interest payment."). Ultimately, the jury found that "*each* PCI interest payment to Boosalis was made with intent to hinder, delay, or defraud PCI creditors." Ante at 8 (emphasis added) (cleaned up). Nothing in the district court's opinions or jury instructions leads me to believe it applied an impermissible presumption or otherwise departed from Minnesota Supreme Court precedent.

B.

More broadly, I do not believe Finn forecloses the conclusion that the interest payments in these cases were not made in exchange for reasonably equivalent value. As the court's opinion acknowledges, Finn did not address whether interest payments made in the thick of a Ponzi churn are void under Minnesota law. Ante at 13; see In re Petters Co., Inc., 550 B.R. 457, 481 (Bankr. D. Minn. 2016). Rather, because reasonably equivalent value must be assessed under the "facts and circumstances of each case," Finn, 860 N.W.2d at 650, Finn decided only that disbursements paid to investors who purchased loan-participation interests, some of which were made "in consequence of investment into legitimate, real business transactions," were in exchange for satisfaction of an antecedent debt. In re Petters Co., Inc., 550 B.R. at 463; see Finn, 860 N.W.2d at 655–56.

The facts and circumstances of Kanios and Boosalis are substantially different from those of Finn. Here, the challenged transfers were "part of a serial churn of funds propelled sequentially by fraud in the inducement on non-existent underlying investments." Id. at 467. Contrary to what lenders were led to believe, none of their loans were actually used to purchase overstocked merchandise. See Kanios, 383 F. Supp. 3d at 861, 863. Instead, they were used to pay earlier investors in the scheme. Id. at 863. The Minnesota Supreme Court's concerns about painting transfers with too broad a brush are simply not salient here.

In Finn, the Minnesota Supreme Court held that "any legally enforceable right to payment against the debtor is sufficient to qualify as an antecedent debt under MUFTA." 860 N.W.2d at 651 (citing Kummet v. Thielen, 298 N.W. 245, 247 (Minn. 1941)). "[S]atisfaction of an antecedent debt," in turn, "can constitute reasonably equivalent value." Id. at 650 (citing Minn. Stat. § 513.43(a)). But the court was silent on whether it would consider interest payments made pursuant to fictitious loans, with funds fraudulently obtained from other lenders, to be "legally enforceable" and therefore not subject to claw back. There is reason to believe, however, the Minnesota Supreme Court would say they are not.

I find it instructive that Finn emphasized MUFTA was designed to "prevent debtors from placing property that is otherwise available for the payment of their debts out of the reach of their creditors." Id. 644 (quoting Citizens State Bank Norwood Young Am. v. Brown, 849 N.W.2d 55, 60 (Minn. 2014)). This focus on MUFTA's purpose leads me to believe the Minnesota Supreme Court would oppose a rule allowing Ponzi-scheme debtors to deplete the assets available to creditors. Indeed, Finn expressly acknowledged that "[i]n many Ponzi schemes, it is true that there is no legitimate source of earnings and the payment of profits confers no benefit on the Ponzi scheme but merely depletes the scheme's resources faster." Id. at 652 (cleaned up) (quoting Scholes v. Lehmann, 56 F.3d 750, 757 (7th Cir. 1995) (holding that investors may retain profits they unwittingly made from a Ponzi scheme only if the debtor's payment of those profits, which necessarily reduced the net assets of the estate, "was offset by an equivalent benefit to the estate")).

The Minnesota Court of Appeals has described the position articulated in both Scholes and Donell v. Kowell, 533 F.3d 762 (9th Cir. 2008), as "consistent with the UFTA drafters' explanation that value is to be determined in light of the purpose of the Act to protect a debtor's estate from being depleted to the prejudice of the debtor's unsecured creditors" and that "consideration having no utility from a creditor's viewpoint does not satisfy the statutory definition of value." Finn v. All.

-33-

<u>Bank</u>, 838 N.W.2d 585, 602 (Minn. Ct. App. 2013) (affirmed as modified by <u>Finn</u>, 860 N.W.2d 638) (cleaned up). Nothing in the Minnesota Supreme Court's opinion indicates it would disagree with this assessment. Based on my reading of the Minnesota Supreme Court's decision in <u>Finn</u>, I think the court would examine each individual transfer at issue to decide whether it conferred "value" on the Ponzi scheme operator.

Pre-MUFTA cases addressing whether contracts that relate only peripherally to fraudulent or illegal activity are legally enforceable are not to the contrary. <u>See ante</u> at 14–15 (citing, among other cases, <u>Anheuser-Busch Brewing Ass'n v. Mason</u>, 46 N.W. 558, 558–59 (Minn. 1890); <u>Johnstown Land Co. v. Brainerd Brewing Co.</u>, 172 N.W. 211, 212 (Minn. 1919); <u>Watson v. Goldstein</u>, 219 N.W. 550, 551 (Minn. 1928)). Unlike the early Minnesota cases, the illegal activity in the cases now before us was not merely adjacent to the agreements at issue. It was the motivating purpose behind them.

In my view, the district court properly applied <u>Finn</u> to the unique "facts and circumstances" of these cases. 860 N.W.2d at 647, 650. Further, I do not consider the district court's conclusion that the interest payments at issue were not in exchange for reasonably equivalent value to be inconsistent with <u>Finn</u>. The Minnesota Supreme Court left open the possibility that such interest payments, when made in connection with a Ponzi scheme unsupported by any legitimate business transaction, using money siphoned from earlier lenders, are void under Minnesota law. Respectfully, I dissent as to Section II but otherwise concur in the court's opinion.

_____